**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jose LOMBERA–CAMORLINGA,**
**Defendant–Appellant.**

**No. 98–50347.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted En Banc
Dec. 16, 1999.

Filed March 6, 2000.

Benjamin L. Coleman, Assistant Federal Public Defender, San Diego, California, for the defendant-appellant.

David S. Kris, United States Department of Justice, Washington, D.C., for the plaintiff-appellee.

William J. Aceves, California Western School of Law, San Diego, California, for the amicus.

Before: HUG, Chief Judge, BROWNING, SCHROEDER, BOOCHEVER, KOZINSKI, O'SCANNLAIN, KLEINFELD, THOMAS, McKEOWN, WARDLAW, and W. FLETCHER, Circuit Judges.

Opinion by Judge SCHROEDER; Dissent by Judge BOOCHEVER; Dissent by Judge THOMAS.

SCHROEDER, Circuit Judge:

Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, provides that law enforcement officials "shall inform" arrested foreign nationals of their right to notification of their consulates. A panel of this court held that Article 36 creates an individual right that is enforceable in the courts of the United States. *United States v. Lombera–Camorlinga*, 170 F.3d 1241, 1242–43 (9th Cir. 1999) (withdrawn). Reversing the ruling of the district court, the panel further held that a defendant's post-arrest statements made before being advised of this right are inadmissible in a subsequent criminal prosecution, provided the defendant can show prejudice from the lack of notification. *Id.* at 1243–44.

We voted to accept en banc review of the case to consider whether the suppression of evidence is an appropriate remedy for violation of the Vienna Convention. We now hold that it is not, for there is

nothing in the language or operation of the treaty provision to suggest Article 36 was intended to create an exclusionary rule with protections similar to those announced by the United States Supreme Court three years later in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In reaching this decision, we give some weight to the State Department's interpretation of the treaty, set forth in a letter originally submitted in conjunction with similar litigation currently pending in the First Circuit, *United States v. Nai Fook Li*, Nos. 97–2034, et al. We do not decide whether the treaty creates individual rights that are judicially enforceable in other ways.

The underlying facts are not in dispute. Jose Lombera–Camorlinga, a citizen of Mexico, was arrested at the Calexico, California port of entry when 39.3 kilograms of marijuana were found in his vehicle. Before questioning Lombera–Camorlinga, officers advised him of his Miranda rights but did not inform him of any rights under the Vienna Convention, nor did they contact the Mexican consular post. Lombera–Camorlinga subsequently made self-incriminating statements.

After his indictment on charges of importation of marijuana and possession of marijuana with intent to distribute, Lombera–Camorlinga moved for suppression of his post-arrest statements on the ground that they were obtained in violation of Article 36 of the Vienna Convention. The district court denied the motion, and Lombera–Camorlinga entered a conditional guilty plea and appealed his subsequent conviction. On appeal, a panel of this court held that the district court erred in denying the motion to suppress without first making a determination of prejudice. *Lombera–Camorlinga*, 170 F.3d at 1244. In so doing, the panel held that (1) the Vienna Convention creates judicially enforceable individual rights, and (2) suppression may serve as a remedy for the violation of these rights if the foreign national can demonstrate prejudice. *Id.* at

1242–44. A majority of the active, nonrecused judges of this court voted to rehear the case en banc. Our en banc review was aided by the excellent quality of oral argument on behalf of both the appellee and appellant.

The Vienna Convention is a 79–article, multilateral treaty to which both the United States and Mexico are signatories. It was negotiated in 1963 and ratified by the United States in 1969, thereby becoming the supreme law of the land. *See* U.S. Const. art. VI, cl. 2. Its provisions cover a number of issues that require consular intervention or notification, including the death of a foreign national, the necessity of appointing a guardian or a trustee for a foreign national who is also a minor, the crash of a foreign airplane or the wreck of a foreign boat, and the arrest or detention of a consular officer. Article 36 deals with what a member state must do when a foreign national is arrested. It provides, in relevant part:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

. . . .

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.

The panel held that in addition to creating obligations between nations, Article 36 creates individual rights enforceable in the courts of the United States. The panel looked primarily to the plain language of the provision, which states that the foreign national is to be informed of "his rights"

under that section. Also lending some support to this view is the fact that the contact with the foreign consulate is required only if the foreign national requests it. Domestic law enforcement authorities thus have no obligation to the foreign consulate unless the foreign national himself triggers one. This implies that the provision exists for the protection of the foreign national.

The Supreme Court has treated the issue of whether the provision creates any judicially enforceable rights as an open question, stating in *Breard v. Greene,* 523 U.S. 371, 376, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998), that the Vienna Convention "arguably" creates individual rights. Our own court has on at least two occasions, in a different but related context, recognized a judicially enforceable right to request consular notification in deportation proceedings. *See United States v. Rangel–Gonzales,* 617 F.2d 529 (9th Cir.1980); *United States v. Calderon–Medina,* 591 F.2d 529 (9th Cir.1979). In those cases, however, the Department of Justice had embodied the Vienna Convention provisions in a corresponding INS regulation, 8 C.F.R. § 242.2(e), and we relied on that regulation in reaching our decisions. *See Rangel–Gonzales,* 617 F.2d at 530; *Calderon–Medina,* 591 F.2d at 531. We had no occasion to hold that the violation of the treaty alone was sufficient to permit a foreign national to overturn a deportation.

On a general level, the Supreme Court has recognized that treaties can in some circumstances create individually enforceable rights. *See United States v. Alvarez–Machain,* 504 U.S. 655, 659–60, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992). The leading example is *United States v. Rauscher,* 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), holding that through the provisions of an extradition treaty, the requirement of specialty-permitting prosecution only for the crime on which extradition was based-could serve as a defense to an attempted prosecution for another crime. See *id.* at 420, 7 S.Ct. 234. The Court's reasoning in *Rauscher* relied on the specific provisions of the particular extradition treaty invoked as a defense. *See id.* at 418–19, 7 S.Ct. 234. In *Alvarez–Machain* the Court considered the extradition treaty between the United States and Mexico, which establishes an orderly process for transferring individuals from one country to the other for criminal prosecution. The Court held that because the treaty failed to expressly prohibit U.S. law enforcement from circumventing this process and abducting Mexican citizens in order to force them to stand trial in the United States, such conduct could not serve as a defense to jurisdiction. 504 U.S. at 664–70, 112 S.Ct. 2188. Whether or not treaty violations can provide the basis for particular claims or defenses thus appears to depend upon the particular treaty and claim involved.

The government argues strenuously that Article 36 creates no judicially enforceable individual rights of any kind, calling our attention to the Vienna Convention's preamble language, which states that the "purpose of [consular] privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts...." Appellant rejoins that in *Calderon–Medina* we declined to endorse the same argument, pointing out that the "protection of some interests of aliens as a class is a corollary to consular efficiency." 591 F.2d at 531 n. 6. The preamble is therefore not particularly helpful to our analysis.

We need not decide whether to accept the government's argument that Article 36 creates no individually enforceable rights, however. We agree with the government's alternative position that assuming that some judicial remedies are available for the violation of Article 36, the exclusion in a criminal prosecution of evidence obtained as the result of post-arrest interrogation is not among them.

In arguing· that the statements should be suppressed, appellants urge us to make the unwarranted assumption that the treaty was intended to serve the same purposes as *Miranda* in enforcing the rights to counsel and against self-incrimination in the post-arrest context. Yet, the treaty does not link the required consular notification in any way to the commencement of police interrogation. Nor does the treaty, as *Miranda* does, require law enforcement officials to cease interrogation once the arrestee invokes his right. *See Miranda*, 384 U.S. at 444–45, 86 S.Ct. 1602. Furthermore, while the rights to counsel and against self-incrimination are secured under the Fifth and Sixth Amendments to our own Constitution and are essential to our criminal justice system, they are by no means universally recognized or enforced. *See Miranda*, 384 U.S. at 442–43, 86 S.Ct. 1602 (stating that the Fifth Amendment's right against self-incrimination "had its origin in a protest against the inquisitorial ... methods of interrogating accused persons, which have long obtained in the continental system") (quoting *Brown v. Walker*, 161 U.S. 591, 596–97, 16 S.Ct. 644, 40 L.Ed. 819 (1896)). *See also* Gordon Van Kessel, *European Perspectives on the Accused as a Source of Testimonial Evidence*, 100 W. Va. L.Rev. 799, 810 (1998) (explaining that even today European countries typically afford no right to counsel during police questioning); Diane Marie Amann, *A Whipsaw Cuts Both Ways: The Privilege Against Self–Incrimination in an International Context*, 45 UCLA L.Rev. 1201, 1251–54 (1998) (reporting the recent development of a right to silence in other countries but noting that the right generally remains less expansive than the Fifth Amendment right in the United States). There is no reason to think the drafters of the Vienna Convention had these uniquely American rights in mind, especially given the fact that even the United States Supreme Court did not require Fifth and Sixth Amendment post-arrest warnings until it decided *Miranda* in 1966, three years after the treaty was drafted. Judge Thomas's dissent discusses the longer history of the exclusionary rule for an involuntary confession, but that is not the issue we must decide.

■ Although appellant contends that the exclusionary rule is the usual and, in this instance, only effective way to enforce the treaty's requirement, this and other circuits have held in recent years that an exclusionary rule is typically available only for constitutional violations, not for statutory or treaty violations. *See United States v. Smith*, 196 F.3d 1034, 1040 (9th Cir.1999) ("The use of the exclusionary rule is an exceptional remedy typically reserved for violations of constitutional rights."). *See also United States v. Hensel*, 699 F.2d 18, 29 (1st Cir.1983) (rejecting suppression as a remedy for a treaty violation because the exclusionary rule "was not fashioned to vindicate a broad, general right to be free of agency action not 'authorized' by law, but rather to protect certain specific, constitutionally protected rights of individuals."); *United States v. Ware*, 161 F.3d 414, 424 (6th Cir.1998) (holding a statutory violation insufficient to justify imposition of the exclusionary rule, absent an underlying constitutional violation or right); *United States v. Mason*, 52 F.3d 1286, 1289 n. 5 (4th Cir.1995) (same); *United States v. Thompson*, 936 F.2d 1249, 1251 (11th Cir.1991) (holding a statutory violation insufficient to justify imposition of the exclusionary rule, absent an underlying constitutional violation or right or evidence that Congress intended exclusion as a remedy); *United States v. Benevento*, 836 F.2d 60, 69 (2d Cir.1987) (same); *United States v. Kington*, 801 F.2d 733, 737 (5th Cir.1986) (same).

■ We do not limit the exclusionary rule to use as a remedy for constitutional violations alone. The Supreme Court some time ago indicated that an exclusionary remedy may be available for violations of provisions of law other than the Constitution. *United States v. Blue*, 384 U.S.

251, 255, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966). Our court has occasionally permitted evidence to be excluded as a remedy in cases involving certain statutory violations. *See United States v. Doe,* 170 F.3d 1162, 1168 (9th Cir.1999) (violation of the Juvenile Delinquency Act's parental notification provision); *United States v. Van Poyck,* 77 F.3d 285, 288 (9th Cir.1996) (violation of Fed.R.Crim.P. 5); *United States v. Negrete–Gonzales,* 966 F.2d 1277, 1283 (9th Cir.1992) (violation of Fed.R.Crim.P. 41); *United States v. Soto–Soto,* 598 F.2d 545, 550 (9th Cir.1979) (violation of 19 U.S.C. § 482). None of these cases shed much light on the propriety of using exclusion to remedy treaty violations, however, and the infrequency with which we have allowed an exclusionary remedy for a non-constitutional harm belies appellant's claim that exclusion is the normal or default rule in such circumstances.

Lacking any direct guidance from the Supreme Court or this court regarding the appropriateness of an exclusionary remedy for a violation of the Vienna Convention, appellant asks us to look by analogy to *Rangel–Gonzales* and *Calderon–Medina,* which concerned an INS regulation requiring consular notification during the deportation process. Although the regulation was promulgated to ensure compliance with the Vienna Convention, *Rangel–Gonzales* and *Calderon–Medina* did not consider the treaty directly. The cases held that an alien who can show prejudice stemming from the INS's failure to follow its own regulation requiring notification cannot later be prosecuted for illegal reentry because the defendant was never legally deported under U.S. law in the first place. *See Rangel–Gonzales,* 617 F.2d at 530; *Calderon–Medina,* 591 F.2d at 530. *Rangel–Gonzales* and *Calderon–Medina* are therefore only tangentially relevant to the question of whether a violation of a treaty can be remedied by exclusion of evidence in a criminal prosecution.

While the panel was provided with "scant authority" on this issue, 170 F.3d at 1244, the State Department has now spoken, and has expressed its opinion that suppression is an inappropriate remedy. In *Factor v. Laubenheimer,* 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315 (1933), the Supreme Court stated that in resolving doubts about interpretation, "the construction of a treaty by the political department of the government, while not conclusive upon courts called upon to construe it, is nevertheless of weight." *Id.* at 295, 54 S.Ct. 191. *See also El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 168, 119 S.Ct. 662, 671, 142 L.Ed.2d 576 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."); *Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight."). It is true that courts tend to give less weight to an executive branch position adopted in the course of litigation, as is the case here, than to an interpretation made in diplomatic relations with other countries. *See* Restatement (Third) of Foreign Relations § 326 reporters' note 2. Given that the Vienna Convention is silent-and therefore ambiguous, at best-on whether or not suppression is an appropriate remedy, however, the State Department's opinion that it is not deserves at least some deference.

Equally important, the State Department's position is well-supported. The State Department indicates that it has historically enforced the Vienna Convention itself, investigating reports of violations and apologizing to foreign governments and working with domestic law enforcement to prevent future violations when necessary. The addition of a judicial enforcement mechanism contains the possibility for conflict between the respective powers of the executive and judicial branches. Moreover, the fact that the State Department is willing to and in fact

does work directly with law enforcement to ensure compliance detracts in this instance from the traditional justification for the exclusionary rule: that it is the only available method of controlling police misconduct. *See Arizona v. Evans,* 514 U.S. 1, 10–11, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) ("The exclusionary rule operates as a judicially created remedy designed to safeguard against future violations ... through the rule's general deterrent effect. As with any remedial device, the rule's application has been restricted to those instances where its remedial objectives are thought most efficaciously served.") (citations omitted).

The State Department also points out that no other signatories to the Vienna Convention have permitted suppression under similar circumstances, and that two (Italy and Australia) have specifically rejected it. In the Australian decision, *R v. Abbrederis,* (1981) 36 A.L.R. 109, the court concluded as we do today that the Vienna Convention's Article 36 protections neither target police interrogation nor seek to prevent self-incrimination or preserve the right to counsel. The opinion stated: "Even giving the fullest weight to the prescriptions in Art 36, I do not see how it can be contended that they in any way affect the carrying out of an investigation by interrogation." By refusing to adopt an exclusionary rule, we thus promote harmony in the interpretation of an international agreement. *See* Restatement (Third) of Foreign Relations § 325 cmt. d ("Treaties that lay down rules to be enforced by the parties through their internal courts or administrative agencies should be construed so as to achieve uniformity of result despite differences between national legal systems.").

## CONCLUSION

The language of the Vienna Convention and its operation over the last 30 years support the government's position that a foreign national's post-arrest statements should not be excluded solely because he made them before being told of his right to consular notification. We therefore affirm the judgment of the district court on the ground that it properly refused to exclude Lombera–Camorlinga's statements. We do not decide whether a violation of Article 36 may be redressable by more common judicial remedies such as damages or equitable relief.

AFFIRMED.

BOOCHEVER, Circuit Judge, with whom Judges JAMES R. BROWNING and THOMAS join, dissenting:

The majority opinion purports to avoid deciding whether Article 36 of the Vienna Convention creates individually enforceable rights to consular notification. "[A]ssuming that some judicial remedies are available for the violation of Article 36," Majority Opinion at 885, the majority nevertheless leaves as the only current form of enforcement the State Department's self-described practice of "investigating reports of violations and apologizing to foreign governments, and working with domestic law enforcement to prevent further violations when necessary." Majority Opinion at 887. This is equivalent to securing enforcement by a toothless, clawless lion. Defendants who actually have been prejudiced by the failure to be notified of their Article 36 rights may suffer imprisonment and other punishments to which they would not have been subjected had their rights been observed. Such an interpretation of the treaty hardly conforms to the due process principles embodied in the United States Constitution. We should not so interpret the treaty.

The majority reasons that some other countries do not recognize or enforce the rights to counsel and against self-incrimination in the same manner as does our country. This is irrelevant, as the treaty does not specify an exclusive means for enforcing the provisions of Article 36. That two of the more than 161 signatory countries have concluded that the Vienna Convention's Article 36 protections "nei-

ther target police interrogation nor seek to prevent self-incrimination or preserve the right to counsel," Majority Opinion at 888, hardly dictates how the treaty provisions should be enforced in the United States. A foreign national arrested and prosecuted in the United States is entitled to the protections of our Constitution and the procedures of our criminal justice system. A foreign national whose right to counsel or against self-incrimination is violated in this country is entitled to suppression of evidence even if such a violation has no remedy in another country.

I agree with the majority's conclusion that "a foreign national's post arrest statements should not be excluded *solely* because he made them before being told of his right to consular notification." Majority Opinion at 888 (emphasis added). Unlike a *Miranda* violation, a violation of Article 36 does not automatically require suppression. But when the foreign national can show that he or she has been prejudiced by the failure to advise him or her of such a right, that prejudice should be rectified according to the protections accorded by our Constitution. District courts are perfectly capable of making the factual determination whether a foreign national was prejudiced. *See, e.g., United States v. Miranda,* 65 F.Supp.2d 1002, 1007 (D.Minn.1999); *United States v. Alvarado–Torres,* 45 F.Supp.2d 986, 991 (S.D.Cal. 1999); *United States v. Tapia–Mendoza,* 41 F.Supp.2d 1250, 1254–55 (D.Utah 1999); *United States v. Chaparro–Alcantara,* 37 F.Supp.2d 1122, 1126–27 (C.D.Ill.1999) (all making factual finding that defendants did not establish prejudice from failure to inform them of right to contact consul).

Because I agree with Judge Pregerson's opinion in this case (now withdrawn), I repeat significant portions of its reasoning here. *See United States v. Lombera–Camorlinga,* 170 F.3d 1241, 1242 (9th Cir. 1999) (withdrawn).[1]

Article 36(1)(b) of the Vienna Convention on Consular Relations provides:

> [I]f he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.*

Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, 101 (emphasis added). As a treaty made under the authority of the United States, the Vienna Convention is the supreme law of the land. U.S. Const. art. VI, cl. 2.

It is undisputed that the customs officers who took Lombera–Camorlinga's statements did not inform him of the rights established by Article 36. Therefore, the customs officers violated the Vienna Convention.

While one of the purposes of Article 36 is to "facilitat[e] the exercise of consular functions relating to nationals of the sending State," Convention, Art. 36(1), foreign nationals are more than incidental beneficiaries of Article 36(1)(b). The treaty language itself clearly states that the rights enumerated in sub-paragraph 36(1)(b) belong to the foreign national: "The said authorities shall inform *the person concerned* without delay of *his rights under this sub-paragraph.*" Convention, Art. 36(1)(b) (emphasis added). It strains the English language to interpret "his rights" in this context to refer to the Consulate's rights. We held in *United States v. Rangel–Gonzales,* 617 F.2d 529, 532 (9th Cir. 1980), that "[t]he right established by the

---

**1.** Although I have adopted substantial portions of that opinion verbatim, for ease in reading this dissent, direct quotation is not further indicated.

regulation and in this case by treaty is a personal one."

Moreover, the language of the provision is not precatory, but rather mandatory and unequivocal. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 441, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (contrasting mandatory obligations and "precatory" provisions under the United Nations Protocol Relating to the Status of Refugees). Accordingly, individual foreign nationals have rights under Article 36(1)(b) of the Vienna Convention.

It has long been recognized that, where treaty provisions establish individual rights, these rights must be enforced by the courts of the United States at the behest of the individual. *See United States v. Rauscher,* 119 U.S. 407, 418–19, 7 S.Ct. 234, 30 L.Ed. 425 (1886) (citing *Head Money Cases,* 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884)); *see also United States v. Alvarez–Machain,* 504 U.S. 655, 659–60, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992) (recognizing the continuing authority of *Rauscher*). Because Article 36(1)(b) establishes individual rights, these rights must be enforced by our courts.

In determining an appropriate remedy for an Article 36 violation, we should look first to the language of the Article. *See Alvarez–Machain,* 504 U.S. at 663, 112 S.Ct. 2188 ("In construing a treaty ... we first look to its terms to determine its meaning."). The majority goes beyond the treaty language to rely heavily on a letter from the State Department filed in conjunction with litigation in the First Circuit. As the majority acknowledges, however, that letter is entitled to little deference, as it was prepared in the course of litigation. We should defer even less to the post-hoc rationalization of an agency charged with enforcement of a treaty provision when its enforcement has been so notably lax.

Article 36(2) provides: "The rights referred to in paragraph 1 of this article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended." Convention, Art. 36(2).

Despite the importance of the Vienna Convention, and its status as the supreme law of the land, law enforcement officials continue to overlook the rights Article 36(1)(b) establishes for foreign nationals who are "arrested, in prison, custody or detention." Convention, Art. 36(1)(b). By failing to complain of these violations at trial, however, most individual defendants have "failed to exercise [their] rights under the Vienna Convention in conformity with the laws of the United States." *Breard v. Greene,* 523 U.S. 371, 375–76, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998). As a result, violations of the Convention have often gone judicially unredressed. *See, e.g., id.; Villafuerte v. Stewart,* 142 F.3d 1124, 1125 (9th Cir.1998); *LaGrand v. Stewart,* 133 F.3d 1253, 1261 (9th Cir.), *cert. denied,* 525 U.S. 971, 119 S.Ct. 422, 142 L.Ed.2d 343 (1998) (all holding that the Convention claim was procedurally defaulted).

By raising his claim in a pretrial suppression motion, the appellant exercised his rights under the Convention in conformity with our laws. *See Breard v. Pruett,* 134 F.3d 615, 622 (4th Cir.1998) (Butzner, J., concurring) ("The provisions of the Convention should be implemented before trial when they can be appropriately addressed.")

There is scant authority for the remedy in criminal cases involving violation of Article 36 of the Convention. We have addressed this issue, however, in cases involving prosecution for illegal entry following deportation. In *United States v. Calderon–Medina,* 591 F.2d 529, 531 (9th Cir.1979), an alien had not been advised of his right to consult consular officials in the underlying deportation under 8 C.F.R. § 242.2(e) (1978), which required the INS to inform the alien of his right to consult with consular authorities. We

concluded that the alien's later prosecution for illegal entry following deportation would be precluded if "the violation prejudiced interests of the alien which were protected by the regulation." *Id.* As we explained in *Calderon–Medina,* § 242 was intended to ensure compliance with Article 36 of the Vienna Convention and to protect some interests of the alien, rather than of the consulate. *Id.* at 531 n. 6. Therefore, we remanded for the district court to consider whether these interests had been prejudiced.

In *Rangel–Gonzales,* 617 F.2d at 531, we applied the standards laid down in *Calderon–Medina.* We held that because the defendant carried his burden to show some likelihood that had the same regulation "been followed his defense and the conduct of the hearing would have been materially affected," the indictment for illegal entry should have been dismissed. *Id.* We concluded that the violation prejudiced the interests of the defendant as protected by the INS regulation and, by association, the Vienna Convention. As Judge Schroeder wrote:

> The appellant showed he did not know of his right to contact the consular officials, that he would have done so had he known, and that such consultation may well have led not merely to appointment of counsel, but also to community assistance in creating a more favorable record to present to the immigration judge on the question of deportation.

*Id.* The government produced no evidence to rebut that showing. *See id.* at 533.

I see no reason why the same standard should not apply in this case. Upon a showing that the Vienna Convention was violated by a failure to inform the alien of his right to contact his consulate, the defendant in a criminal proceeding has the initial burden of producing evidence showing prejudice from the violation of the Convention. If the defendant meets that

burden, it is up to the government to rebut the showing of prejudice.

The majority dismisses *Calderon–Medina* and *Rangel–Gonzales* because in those cases an INS regulation implemented Article 36's requirement of consular notification. But the fact that the INS (an agency most likely to have the initial obligation of consular notification) adopted a regulation which clearly regards Article 36 as conferring an individual right argues for, not against, a conclusion that Article 36 establishes an individual right. Further, in those two cases, in which the defendants showed prejudice, this court dismissed the indictments against them, thus according them a remedy even more drastic than the suppression of evidence.

In this case, Lombera–Camorlinga filed a motion to suppress his post-arrest statements because he was not first advised of his rights under the Vienna Convention. The district court denied the motion to suppress without making a determination of prejudice. We therefore should reverse and remand to the district court for a determination whether in making his post-arrest statements, Lombera–Camorlinga was prejudiced by the violation of the Vienna Convention.

THOMAS, Circuit Judge, with whom Judges JAMES R. BROWNING and BOOCHEVER join in full, and with whom Judge WARDLAW joins with respect to Section II, dissenting:

I respectfully dissent from the majority's conclusion that the exclusionary rule is not the appropriate method by which a private right to consular notification should be enforced in the United States.[1] I also respectfully disagree with the majority's holding that deference should be paid to an agency's litigating position.

**1.** The majority does not reach the issue of whether a private right of enforcement exists under the treaty. Rather, it limits its discus-

sion to the judicial remedies afforded by the Treaty. This analysis is similarly confined.

## I

The Vienna Convention on Consular Relations ("Vienna Convention" or "Treaty") requires the United States law enforcement officers to inform arrested foreign nationals of their right to have their respective consulates notified of the arrest. *See Vienna Convention on Consular Relations,* Article 36(1), 21 U.S.T. 77. It further requires that this right be exercised in accordance with the laws of the arresting country. *See id.,* Article 36(2). The majority begins with the assumption that, in the United States, the exclusionary rule is generally available only for constitutional violations. Therefore, the majority concludes, the exclusionary rule cannot be considered the normal method of enforcing private procedural rights, such as those that may be created by treaty.

The syllogism proceeds from a faulty premise. The exclusionary rule as applied to confessions is not uniquely American, nor was it given birth by our Constitution. Rather, it originated from English common law, formally enunciated in *King v. Warickshall,* 168 Eng. Rep. 234, 235 (K.B. 1783):

> A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and therefore it is admitted as proof of the crime to which it refers; but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape when it is to be considered as the evidence of guilt, that no credit ·ought to be given to it; and therefore it is rejected.

2. It is clear that, as a general matter, the Supreme Court has not limited the use of the exclusionary rule to constitutional violations. *See United States v. Blue,* 384 U.S. 251, 255, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966) (noting that the Supreme Court "in a number of areas has recognized or developed exclusionary rules where evidence has been gained in violation of the accused's rights under the Constitution, federal statutes, or federal rules of procedure."); *see also Miller v. United States,*

The *Warickshall* rule continued in United States common law. *See, e.g., Ziang Sung Wan v. United States,* 266 U.S. 1, 14–15, 45 S.Ct. 1, 69 L.Ed. 131 (1924); *Harrold v. Territory of Oklahoma,* 169 F. 47, 54 (8th Cir.1909); *Bram v. United States,* 168 U.S. 532, 542, 18 S.Ct. 183, 42 L.Ed. 568 (1897); *Hopt v. Territory of Utah,* 110 U.S. 574, 585, 4 S.Ct. 202, 28 L.Ed. 262 (1884). Indeed, the doctrine was so ingrained that, by 1813, it was observed in argument that "[i]f the prisoner has been once induced to confess, by a promise or threat, it is the common practice to reject a subsequent confession of the same, or like facts." *United States v. Charles,* 25 F. Cas. 409, 410 (C.C.D.C. 1813).

The first suggestion that the rule excluding improperly obtained confessions had an additional constitutional basis came in *Bram,* 168 U.S. at 542, 18 S.Ct. 183. However, it was not until *Brown v. Mississippi,* 297 U.S. 278, 285–87, 56 S.Ct. 461, 80 L.Ed. 682 (1936), that the Court fully embraced the Constitution as its primary basis for excluding improperly obtained confessions. In short, the application of exclusionary rule to confessions has been firmly established in American jurisprudence from the beginning of the Republic, long before its Constitutional dimension was explored by the courts.

Thus, with respect to confessions, we cannot brush off the exclusionary rule as confined to constitutional violations; indeed, our entire judicial history belies it. The majority acknowledges this by referencing some of the numerous occasions the exclusionary rule has been applied in a statutory context,[2] but discounts those in-

357 U.S. 301, 313–14, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) (upholding suppression of evidence obtained in violation of 18 U.S.C. § 3109, the federal "knock and announce" statute); *Mallory v. United States,* 354 U.S. 449, 455, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) (stating that suppression of statements obtained in violation of Fed.R.Crim.P. 5 would be proper if failure to arraign "without unnecessary delay" provided "an opportunity for the extraction of a confession"). Nor

stances as farrago, with no import in discerning whether the exclusionary rule is our nation's usual judicial remedy for violations of procedural rights. That may well be true in other contexts; for example, the exclusion of evidence obtained from an illegal search distinctly arises from the Fourth Amendment. *See, e.g., Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). However, it is not true as applied to the exclusion of improperly obtained confessions.

The question then is whether it is appropriate to apply the exclusionary rule to confessions obtained in violation of the Vienna Convention. In construing a treaty, we look to its plain words. *See United States v. Alvarez–Machain*, 504 U.S. 655, 663, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992). The Treaty provides that if a prisoner "so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner." Vienna Convention, Article 36(1). It further provides that "[t]he said authorities shall inform the person concerned without delay of his rights under this sub-paragraph." *Id.* All parties, including the United States, agree that this language requires United States law enforcement officials to inform an arrested foreign national of the right to have his or her national consul informed of the arrest. The Supremacy Clause makes treaties, such as the one at bar, "the supreme Law of the Land," binding "the Judges in every State."[3] U.S. Const., Art. VI, cl. 2; *see also Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979) ("[A]ll federal rights, whether created by treaty, by statute, or by regulation, are 'secured' by the Supremacy Clause.").

How is the right to consular notification to be exercised? The Treaty is not silent on this: it provides that the right "shall be exercised in conformity with the laws and regulations of the receiving State."[4]

have we. *See, e.g., United States v. Gantt,* 194 F.3d 987, 994 (9th Cir.1999) (holding that technical violations of Fed.R.Crim.P. 41(d) require suppression if there was a "deliberate disregard of the rule" or "if the defendant was prejudiced"); *United States v. Doe,* 170 F.3d 1162, 1168 (9th Cir.1999) ("Although the § 5033 violation [of the Federal Juvenile Delinquency Act] is not a due process violation, it may serve as an independent basis for suppression.") (citing *United States v. Doe,* 155 F.3d 1070, 1073 (9th Cir.1998) (en banc)), *cert. denied,* —— U.S. ——, 120 S.Ct. 429, 145 L.Ed.2d 335 (1999); *United States v. L.M.K.,* 149 F.3d 1033, 1035 (9th Cir.1998), *as amended,* 166 F.3d 1051 (9th Cir.1999) (stating that violation of § 5033 of Federal Juvenile Delinquency Act may, upon a showing of prejudice, justify limited remedies such as suppression, even though statutory violation does not deny due process), *cert. denied,* —— U.S. ——, 120 S.Ct. 106, 145 L.Ed.2d 89 (1999); *United States v. Van Poyck,* 77 F.3d 285, 288 (9th Cir.1996) (noting that incriminating statements obtained in violation of Fed.R.Crim.P. 5(a) and 18 U.S.C. § 3501(c) may be excluded by the court's discretion); *United States v. Soto–Soto,* 598 F.2d 545, 550 (9th Cir.1979) ("Statutory law was disregarded. Exclusion of the evidence seized is the only available effective deterrent of such disregard."); *cf. United States v. Doe,* 862 F.2d 776, 780–81 (9th Cir.1988) (holding that reversal of conviction is required if alien defendant was prejudiced by government's failure to contact his parents and Mexican Consulate as required by Federal Juvenile Delinquency Act); *United States v. Gatto,* 763 F.2d 1040, 1046 (9th Cir.1985) (suggesting that supervisory power to exclude evidence could be exercised where there is a violation of "any constitutional provision, federal statute, specific discovery order, or any other recognized right").

3. The Supremacy Clause reads in full: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2.

4. Thus, the fact that the exclusionary rule is not referenced in the Treaty is of no moment. The Treaty expressly contemplates that the enforcement mechanism be left to the laws of the arresting nation.

Vienna Convention, Article 36(2). Under our common law, and Constitutional law, improperly obtained confessions are not admitted into evidence. Confessions obtained without informing the defendant of his right to an attorney are inadmissible. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Although the majority places great significance on the fact that *Miranda* was decided after the ratification of the Treaty, *Miranda*'s concerns about custodial interrogation without counsel did not appear as an epiphany: the Supreme Court had long considered denial of counsel a factor in determining whether, under the totality of the circumstances, a confession was voluntary. *See Spano v. New York,* 360 U.S. 315, 323, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); *Harris v. South Carolina,* 338 U.S. 68, 70–71, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949); *Haley v. Ohio,* 332 U.S. 596, 600, 68 S.Ct. 302, 92 L.Ed. 224 (1948); *Malinski v. New York,* 324 U.S. 401, 405–06, 65 S.Ct. 781, 89 L.Ed. 1029 (1945).

It has also long been part of our law that the exclusionary rule applies to confessions obtained in violation of a defendant's right to be brought promptly before a judicial officer. *See Mallory v. United States,* 354 U.S. 449, 455, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); *McNabb v. United States,* 318 U.S. 332, 341, 63 S.Ct. 608, 87 L.Ed. 819 (1943).[5] The *McNabb–Mallory* rule is relevant here because its theoretical underpinnings are similar to those upon which Article 36 rests, in that a similar duty to act with dispatch is imposed by the Treaty for the purpose of safeguarding rights.[6]

Thus, when rights such as the right to have a consulate notified *without delay* have been violated, our courts have long applied the exclusionary rule as the remedy of choice under our law. The procedural protections we have required before admitting confessions as evidence were established to ensure that confessions were voluntary and obtained without employing improper means. Voluntariness is of special concern in the case of detained foreigners, who may neither speak English nor understand legal proceedings.[7] The panel's requirement that the defendant show prejudice is also consistent with our common law rule that the totality of the circumstances be considered in determining whether a confession was voluntary.[8]

The majority quite properly does not opine as to what remedies are available for enforcement of the right to consular notification. However, if one peeks behind the curtain, other alternatives are not attractive, nor are they consistent with the Treaty. In fact, the only options readily

5. It is also noteworthy that the *McNabb–Mallory* rule was not constitutionally based: *McNabb* was founded on the Supreme Court's "exercise of its supervisory authority over the administration of criminal justice in the federal courts," 318 U.S. at 340, 63 S.Ct. 608, and *Mallory* was based on violations of procedural rules, *see* 354 U.S. at 451–52, 77 S.Ct. 1356.

6. In its publication on the issue, the Department of State states that the requirement that the detained foreign national be informed of his right to contact his consulate "facilitate[s] the foreign government's ability to protect its nationals" including ensuring "they receive a fair and speedy trial with benefit of counsel." Department of State, *Consular Notification and Access* 42–43 (1998).

7. Indeed, that was the essence of Paraguay's claim against the United States in the International Court of Justice regarding the case of Angel Breard. Paraguay contended that Breard had language difficulty and that his confession "was based on a misunderstanding of the United States justice system" and that if the United States had complied with its duty of consular notification the "result would have been different." *In the Case Concerning the Application of the Vienna Convention on Consular Relations (Paraguay v. United States),* 1998 I.C.J. (April 7) (Request for Indication of Provisional Measures, Verbatim Record).

8. The majority reports that the confession in this case was voluntary. However, that conclusion was not based on a "totality of the circumstances" analysis that included the absence of consular notification as part of the examination.

apparent are private damage actions, or an acknowledgment that the Treaty created a private right without any remedy at all. The Treaty does not provide expressly for private damage actions. Rather, the plain words of the Treaty provide that the notification right "shall be exercised," not that failure to notify should be compensated. Thus, the Treaty would not seem to contemplate private damage actions, and it would not be sound judicial policy to conjure a legal theory that would expose individual officers to liability for breaches of international treaties. The decision on whether to attach individual liability for such violations should be left to Congress.

That the right to consular notification may be a right without a remedy is also inconsistent with the Treaty's command that the right "be exercised in conformity with the laws and regulations" of the arresting state. Our law of criminal procedure is not merely aspirational; when a procedural right has been established, it is enforced. Thus, alternative readings of what enforcement mechanism might exist under our laws simply do not make sense, either textually or in the context of how our criminal procedural laws are administered.

As a matter of judicial administration, it is also far better to resolve any question about the voluntariness of a confession before trial, rather than confront the question for the first time at the behest of a foreign government on the eve of an execution. *See, e.g., Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998); *Villafuerte v. Stewart,* 142 F.3d 1124, 1125 (9th Cir.1998); *LaGrand v. Stewart,* 133 F.3d 1253, 1261 (9th Cir.), *cert. denied,* 525 U.S. 971, 119 S.Ct. 422, 142 L.Ed.2d 343 (1998).

For these reasons, I conclude that if a private right to consular notification exists under the Vienna Convention, the exclusionary rule is the appropriate method for enforcing that right in the United States when a defendant can demonstrate actual prejudice from the treaty violation.

## II

I must respectfully also part company from the majority in its holding that we must defer to an agency's litigating position. The Supreme Court has rejected such deference. *See, e.g., Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). So have we. *See, e.g., Resource Invs., Inc. v. U.S. Army Corps of Eng'rs,* 151 F.3d 1162, 1165 (9th Cir.1998). There is a sound basis for this rule. As the Supreme Court has explained, "Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands." *Investment Co. Institute v. Camp,* 401 U.S. 617, 628, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). Administrative agency constructions of governing statutes, or in this case a treaty, performed outside the adversary system are properly worthy of deference. However, agency positions developed in response to a lawsuit are not of the same character: they are specifically tailored to help obtain a favorable outcome in a pending controversy in which the agency is involved. Although we must certainly consider the persuasive force of the agency's argument, it is just that. The arguments advanced by an agency in litigation ought to rise or fall on their own weight.

Deference in this case is especially inappropriate because it is given to the agency's litigation position in entirely separate litigation in another circuit. The reasoning of the Department of State has proved persuasive; we need not adopt a special rule deferring to its assertions as a matter of law. I respectfully suggest that we gravely err in creating such a rule.

## III

A nation's commitment to the rule of law is measured by its willingness to subject its own government to it. The Vienna Convention requires the United States law enforcement officers to inform arrested

foreign nationals of their right to have their respective consulates notified of the arrest. It further requires that this right be exercised in accordance with the laws of the arresting country. These obligations were not conjured by the judiciary: they were negotiated by the President and ratified by the United States Senate. Each year, the Department of State notifies law enforcement officials of their obligations under the Treaty.

Although we must be cautious not to intrude into the foreign policy of the United States, this treaty calls for enforcement in accordance with our laws. From the inception of our criminal justice system, we have refused to admit evidence of confessions obtained in violation of law. As Justice Frankfurter observed in *McNabb*, "[t]he history of liberty has largely been the history of observance of procedural protections." 318 U.S. at 347, 63 S.Ct. 608. Thus, the exclusionary rule is the proper means of enforcing these specific treaty obligations when the defendant has shown actual prejudice. Our commitment to the rule of law requires us to afford detained foreign nationals our usual procedural remedies, just as we expect foreign governments to respect the rights of our citizens when they travel abroad.