IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 25, 2005 Session

## STATE OF TENNESSEE v. JOSE LUIS QUINTERO

**Direct Appeal from the Criminal Court for Wilson County**
**Nos. 01-1290, 01-1290A & 01-1291, 01-1291A     J. O. Bond, Judge**

---

**No. M2003-02311-CCA-R3-CD - Filed April 22, 2005**

---

After a bench trial, the Defendant, Jose Luis Quintero, was convicted of the first degree murders of Meceia Nelson and Darius Boleyjack.  The Defendant waived a sentencing hearing and agreed to a sentence of two concurrent terms of life imprisonment without the possibility of parole.  In this direct appeal, the Defendant contends that 1) the evidence is not sufficient to support his convictions; 2) the Defendant's statement to the police should have been suppressed; and 3) the trial court erred in allowing a witness to testify about statements made to her by one of the victims.  Finding no errors entitling the Defendant to a reversal, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Gregory D. Smith (on appeal), Clarksville, Tennessee, William Cather (at trial and on appeal), Lebanon, Tennessee, Comer Donnell, (at trial and on appeal), Lebanon, Tennessee, and Michie Gibson (at trial), Nashville, Tennessee, for the appellant, Jose Luis Quintero.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Tom P. Thompson, District Attorney General; and David Durham, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

Margaret Myatt testified that the victim Meceia Nelson was her best friend and neighbor, living just down the street from her in Lebanon, Tennessee.  Ms. Myatt met the Defendant at Ms. Nelson's house about two months prior to the victim's death and saw him there thirty to forty times.  She testified that the victim described her relationship with the Defendant as "just friends," but Ms.

Myatt also testified that the victim and the Defendant had a sexual relationship. At the time of her death, the victim was no longer seeing the Defendant and Ms. Myatt stated that the victim had become "scared" of the Defendant.

On the night of June 30, 2001, Ms. Myatt and Ms. Nelson met at Ms. Myatt's house at about 10:00 or 10:30 and went out for the evening. They arrived at a bar called the Thirsty Turtle at about 11:00 and began drinking, shooting pool, and dancing. Ms. Myatt saw the Defendant near the pool table where the victim was playing. According to Ms. Myatt, the victim knew he was there but Ms. Myatt did not see them talk with one another. She stated that she saw the Defendant follow the victim to the bathroom. Ms. Myatt also stated that, in the parking lot, the Defendant's van was parked right across from where the victim was parked. The Defendant left the club before Ms. Myatt and Ms. Nelson did.

While they were at the Thirsty Turtle, Ms. Nelson introduced Ms. Myatt to Mr. Darius Boleyjack. At about two a.m., Ms. Nelson and Ms. Myatt decided to leave the bar. Because Ms. Nelson was planning on spending the night with Ms. Myatt, Ms. Myatt gave her home and cell phone numbers to Mr. Boleyjack. Ms. Myatt and Ms. Nelson then traveled to the Double Deuce, where they stayed about thirty minutes. The two then returned to Ms. Myatt's home, arriving at about three o'clock in the morning. After their arrival, Ms. Myatt received a phone call from Mr. Boleyjack. Ms. Myatt gave the call to the victim. After this phone call, Ms. Nelson decided to walk back to her house, leaving Ms. Myatt's house at about four a.m.

Ms. Myatt testified that, at 4:48 that morning, she received a phone call from Ms. Nelson. Upon answering the phone, Ms. Myatt heard the victim say, "Margaret you've got to help me." She then heard Ms. Nelson scream and say, "Jose stop, you're going to kill me." Ms. Myatt heard more screams and then heard the victim say "Jose stop you're killing me." Ms. Myatt then heard a thud and the phone went dead. Ms. Myatt called 911.

On cross-examination, Ms. Myatt acknowledged that she and the victim had "had a few drinks" at the Thirsty Turtle. She stated that she only drank beer and did not ingest any drugs. She further stated that the relationship between the victim and the Defendant had ended four or five weeks earlier and that it had "gotten to be a problem." The victim did not tell her about having earlier received flowers and a note from the Defendant.

Lena Jones, a 911 operator, testified that she took a call at approximately 4:45 on the morning in question. A copy of the tape was played for the trial court over the Defendant's objection.[1]

Officer Mike Bay testified that he was the first police officer to arrive at the scene. He determined that the front door was locked. Other officers arrived and found the back door open. The officers entered the house. Officer Bay testified that he saw blood in the kitchen, laundry area, hallway and in the master bedroom. He saw two bodies laying in front of the front door, one a nude

---

[1]This Court has listened to the tape but found the caller's words to be largely unintelligible.

white female and the other a nude black male. The female was laying across the male such that the bodies formed a rough "X." Both bodies had multiple stab wounds. The officers checked the house and determined that no one else was inside. When Officer Bay exited the house through the back door, he saw blood around the back doorknob.

On cross-examination, Officer Bay acknowledged that the initial call to respond reported an altercation in the driveway. He found no blood in the driveway at the scene. Officer Bay interviewed Ms. Myatt that morning and took her statement. Ms. Myatt's handwritten and signed statement was admitted into evidence and includes the following narrative: "at about 4:00 or 4:30

[Ms. Nelson] called and said help me. Then I heard the phone drop and her scream and scream Hoysee over and over."

The preliminary hearing testimony of Fernando Aquino was admitted at trial. The State established that Mr. Aquino was unavailable to testify, having removed himself to Mexico prior to trial. During his preliminary hearing testimony, Mr. Aquino stated that the Defendant arrived at his home at 418 South Maple Street in Lebanon at about 5:30 on the morning of July 1, 2001. According to Mr. Aquino, the Defendant "appeared to be bloody." The Defendant removed his clothes while at Mr. Aquino's home and took a shower. The Defendant told Mr. Aquino that "he had had a fight with a black person and he had killed him." The Defendant asked for fresh clothes and Mr. Aquino provided the Defendant with a shirt; Mr. Aquino's roommate gave the Defendant a pair of pants. Mr. Aquino and his roommate put the Defendant's original clothes in a plastic bag and then in a trash can. Mr. Aquino later watched the police recover this plastic bag.

Mr. Aquino stated that he saw a wound to the Defendant's left hand and another wound to the Defendant's left leg. The Defendant asked Mr. Aquino to move his van, in which he had arrived at Mr. Aquino's house, a few blocks away. Mr. Aquino attempted to comply with this request but could not get the van started. Later that afternoon, after the Defendant had left, the Defendant called Mr. Aquino. Mr. Aquino asked the Defendant what had happened, if he had killed two people. The Defendant said, no, he'd only had a fight with one person and had killed that person. The Defendant then asked Mr. Aquino for money. Mr. Aquino told the Defendant he did not have any and told the Defendant not to call again.

Mr. Medardo Mejia was Mr. Aquino's roommate. He recalled the Defendant's appearance at their residence on the morning of the first and testified that he "seemed like he was bathed in blood." The Defendant said that he had had a fight with a black man at a party. According to the Defendant, the black man had attacked him and told him that "this is your last one." The Defendant told Mr. Mejia that he took away the black man's knife and stabbed him.

Mr. Mejia stated that the Defendant took a shower and changed his clothes, and Mr. Mejia put the Defendant's original clothes in the trash. He, too, saw the police recover these clothes from the trash can.

After the Defendant showered and changed, Mr. Mejia drove the Defendant to Knoxville, then to Carthage, and then finally to Kentucky. They went to Kentucky so that the Defendant could have his wounds treated. They arrived at around dusk, went to a hospital, and then returned to Lebanon at approximately 10:30 or 11:00 that night.

On cross-examination, Mr. Mejia explained that "this is your last one" means that it is the subject's time to die.

Detective Chris Melvin was the first detective on the crime scene, arriving at a few minutes after five a.m. He interviewed Ms. Myatt. His reports on what Ms. Myatt told him were admitted into evidence. Det. Melvin recovered the Defendant's clothing during the early morning hours of July 6 from a trash can at the residence occupied by Mssrs. Aquino and Mejia at 418 South Maple.

Officer Steve Holliday testified that he found the Defendant's van at that address. He saw blood on the driver's door, on the running board, and on the steering wheel. Officer Holliday identified a copy of the vehicle's registration, indicating that it was owned by the Defendant.

Officer Wayne Howard testified that he found a butcher knife in a wooded area behind Ms. Nelson's house.

Carlos Remirez testified that he had been the Defendant's roommate for a little over a year as of July 1, 2001. He worked with the Defendant at the restaurant owned by Ms. Nelson's parents. He understood that the Defendant and Ms. Nelson had been dating.

At about three o'clock in the morning of July 1, the Defendant came home, woke Mr. Ramirez, and asked to borrow his car. The car was not available because Mr. Ramirez was in the process of painting it. Mr. Ramirez returned to sleep.

Later the same day, while Mr. Ramirez was away from home, he heard about the homicides. The police interviewed him that night. He gave the police the key to his apartment. He did not return to his apartment until July 5, at which time he collected his things and moved. A detective called him and asked him to look for a knife. He returned to the apartment to do so, but did not find it. He testified that the knife recovered at the crime scene looked like a knife that he had kept in a kitchen drawer at the residence he shared with the Defendant. He did not know how long the knife had been missing.

Detective Nestor Irizarry testified that he was born in Puerto Rico and that Spanish is his native language. He learned English about twelve years prior to his testimony while in the military. Det. Irizarry interviewed the Defendant on July 2, 2001. This interview was audiotaped and a transcript of the tape was admitted into evidence. Det. Irizarry testified that he asked the Defendant why he had turned himself into the sheriff's department and the Defendant responded "[b]ecause he did something that wasn't right." At the time of the interview, the Defendant had a bandage on his

left hand, some scratches on his face, and he walked with a limp. Det. Irizarry stated that, when told that Ms. Nelson was dead, the Defendant showed distress.

Special Agent Brad Everett with the Tennessee Bureau of Investigation testified that he performed DNA analyses on blood drawn from the Defendant and blood collected from the victims. He also analyzed the items of clothing recovered from 418 South Maple, consisting of a pair of jeans, a shirt, a pair of boxer shorts and a pair of socks. On the pants, he found the Defendant's DNA and Darius Boleyjack's DNA. On the shirt, he found Mr. Boleyjack's DNA. On the shorts, he found the Defendant's DNA. He found the Defendant's DNA on one sock, and Mr. Boleyjack's DNA on the other.

On the knife recovered from the crime scene, he found the Defendant's DNA and Ms. Nelson's DNA. On a piece of wooden fence collected from behind Ms. Nelson's house, he found the Defendant's DNA. In blood samples collected from Ms. Nelson's back patio, he found the Defendant's DNA. The Defendant's DNA was also found in blood collected from the Defendant's van.

Dr. Bruce Levy performed autopsies on both victims. Dr. Levy stated that Mr. Boleyjack had suffered "a total of 54 sharp force injuries to his body including 9 stab wounds, and 45 incised wounds." He explained that stab wounds involved an injury that was "deeper into the body than it is in length along the body. Incise wounds are not very deep. The injury is longer on the body than it is deep inside the body." Dr. Levy stated that numerous of Mr. Boleyjack's wounds were defensive wounds. Dr. Levy determined that the cause of Mr. Boleyjack's death was "multiple stab wounds." Dr. Levy further opined that the knife recovered from the crime scene was "consistent with the injuries seen on Mr. Boleyjack."

Dr. Levy testified that Ms. Nelson "had a total of at least 37 sharp force injuries to her body including 13 stab wounds and 24 cuts or incised wounds." Ms. Nelson's wounds included defensive wounds. She had been stabbed numerous times across her back. According to Dr. Levy, Ms. Nelson died "as a result of numerous stab wounds to her body." Her wounds were consistent with the knife recovered from the crime scene.

On cross-examination, Dr. Levy stated that Mr. Boleyjack had a blood alcohol content of .15 percent, and Ms. Nelson had a blood alcohol content of .188 percent.

The Defendant offered no proof.

The trial court found the Defendant guilty of the first degree premeditated murder of Ms. Nelson; the first degree felony murder of Ms. Nelson; the first degree premeditated murder of Mr. Boleyjack; and the first degree felony murder of Mr. Boleyjack. The trial court subsequently merged the verdicts into one count of first degree murder for the death of Ms. Nelson and one count of first degree murder for the death of Mr. Boleyjack. With the Defendant's agreement, the trial court

subsequently sentenced the Defendant to two concurrent terms of life imprisonment without the possibility of parole.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

The Defendant contends that the evidence is not sufficient to support his convictions of first degree murder. He asserts that, at most, he is guilty of two counts of voluntary manslaughter, defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). We disagree.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

First degree premeditated murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation is further defined as

an act done after the exercise of reflection and judgment. [It] means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Our supreme court has long recognized that whether premeditation is present in a given case is a question of fact to be determined by the fact finder from all of the circumstances surrounding the killing. See, e.g., State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Furthermore, because premeditation involves the accused's state of mind, concerning which there is often no direct evidence, our courts have long recognized that premeditation may be proved by circumstantial evidence. Id. Our supreme court has previously identified several circumstances that may warrant the trier of fact to find or infer premeditation: the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's procurement of a weapon; any advance preparations taken to conceal the crime; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing. Id. at 615. An accused's motive for killing the victim may permit an inference of premeditation. See State v. Nesbit, 978 S.W.2d 872, app. 898 (Tenn. 1998). Moreover, although proof of repeated blows is not in and of itself sufficient to establish premeditation, such proof is relevant to a finding that the defendant killed the victim with premeditation. See State v. Sims, 45 S.W.3d 1, 8 (Tenn. 2001).

In this case, we have no difficulty concluding that the evidence was sufficient to establish that the Defendant killed the victims intentionally and with premeditation. Prior to committing the killings, the Defendant observed Ms. Nelson, with whom he had recently broken up, at a bar. Mr. Boleyjack was also present at the bar. The Defendant left the bar before Ms. Nelson did. The Defendant went home and tried to obtain another vehicle, permitting the inference that he wanted to conceal his identity in what was to follow. The evidence further permits the inference that the Defendant armed himself prior to the murders with a knife he found at his residence. The Defendant drove to Ms. Nelson's residence and entered through the back door. He found the victims naked, at least one of them in bed, and attacked one or both of them there. He continued in spite of Ms. Nelson's screams and pleas to stop. Both of the victims were unarmed and both had multiple defensive wounds as they tried to ward off the Defendant's attacks. Both of the victims were stabbed and cut many, many times. After killing the victims, the Defendant discarded the murder weapon in a wooded area. He then drove to a friend's house where he took a shower, discarded his bloody clothes, donned fresh clothes, arranged to have his vehicle hidden, and fled the area: all actions consistent with destroying and/or secreting evidence. The Defendant's conduct after the murders also permits an inference that he was calm during this period.

This case presents almost a textbook example of first degree premeditated murder. The Defendant's contention that the proof does not support his convictions for that offense is without merit.

Although not specifically challenged by the Defendant in his brief, we further find the evidence sufficient to support the Defendant's convictions of first degree felony murder. The Defendant was charged with killing each victim while in the perpetration of or attempt to perpetrate a burglary.[2] See Tenn. Code Ann. § 39-13-202(a)(2). "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building and commits or attempts to commit a felony, theft or assault[.]" Tenn. Code Ann. § 39-14-402(a)(3). Given that the proof establishes that Ms. Nelson had arranged to meet Mr. Boleyjack at her home, the fact finder was entitled to draw the inference that the Defendant entered the building without Ms. Nelson's consent. Thus, the proof is sufficient to support the trial court's conclusion that the Defendant killed Ms. Nelson and Mr. Boleyjack during the perpetration of a burglary. The evidence therefore supports the alternative convictions of two counts of first degree felony murder.

The Defendant is not entitled to a reversal of his convictions on the grounds of insufficient evidence. This issue is without merit.

## II. SUPPRESSION OF DEFENDANT'S STATEMENT
The Defendant next contends that the trial court erred in failing to suppress his statement to the police. The Defendant argues that his statement was taken in violation of his constitutional rights under Miranda v Arizona, 384 U.S. 436 (1966), and, further, in violation of his rights under the Vienna Convention. We disagree with the Defendant in both respects.

### A. Alleged violation of Miranda
The Defendant is from Mexico where he attended school through the second grade. He moved to this country approximately three years prior to his arrest. His native language is Spanish and he speaks very little English. The trial court proceedings were conducted with an interpreter.

On July 2, 2001, the Defendant turned himself into law enforcement authorities. He was interviewed on behalf of the Lebanon Police Department by Detectives Scott Massey and Nestor Irizarry. Det. Irizarry translated Det. Massey's words into Spanish for the Defendant, and translated the Defendant's words into English for Det. Massey. The interview was audiotaped and a transcript of the tape was prepared by the Spanish interpreter and admitted into evidence at both the suppression hearing and at trial. Thus, this Court has before it as did the trial court, the words spoken by Det. Irizarry to the Defendant and vice versa.

The interview commenced with a short discussion about the Defendant's wounds. Det. Irizarry then told the Defendant, translating from Det. Massey, that before they started talking to him, they needed to advise him about his rights. Det. Irizarry explained that they would read him his

---

[2]The felony murder counts of the indictment also charged the Defendant with killing each victim in the perpetration of or attempt to perpetrate a first degree murder.

rights in both English and Spanish.  Det. Massey then proceeded to read the Defendant his <u>Miranda</u> rights in English.  In Spanish, Det. Irizarry told the Defendant the following:[3]

> Before we ask you anys question, you should understand your rights . . .
> You have the right to remain silent . . .
> Anything you say can be used against you in a court of law . . .
> You have the right to talk to a lawyer so he [she] can advise you and to have . . . him [her] present with you during the questioning, if you want . . .
> If you can't . . . if you don't have the money to pay a lawyer, one can be provided to you, t'represent you before we ask any question . . .
> OK, if you decide to answer questions now, without having a lawyer present, um, you will always have the right to stop answering wha. . . , whenever you like, until you can speak with a lawyer

Det. Massey then moved to the waiver of rights in preparation for asking the Defendant to sign a

written waiver of rights form.  Det. Irizarry explained to the Defendant in Spanish:

> OK, the part he's going to read you now, where it says that you are, um, declining your rights, but you're not.  That's simply that you understand your rights but you decide to talk to us.  At any moment that you say, No, you want to use your rights, you simply stop talking to us, eh. . .

Det. Massey then began reading the waiver of rights portion of the form to the Defendant, as Det.

Irizzary translated:

> And I am willing to, to talk with you, and that what was read is understood, [U.I.], that is, understanding your rights, are you willing to talk with me now. . .
> I do not want a lawyer at this time . . .
> I understand and know what I am doing . . .
> No promise or threat has bee . . . , have been done against me, and no pressure or constraint of any kind, um, has been done, toward me . . .
> Do you understand?

The Defendant replied, "Si," translated as "Yes."  Det. Irizarry continued:

> What he needs now, of . . . , since we already read you your rights and you understand, before we, it, um, continue, it's, we simply need your signature, at the

---

[3]The excerpts from the translated transcription have been repeated verbatim.  The designation "[U.I.]" is defined in the transcript as "unintelligible."

end, and signing it is simply saying that you, that we read you your rights and you understood them. All right?

The Defendant then signed two waiver of rights forms: one in English and one in Spanish, with Det.

Irizarry explaining that the signatures were "showing that you understood your rights. . ." After the Defendant signed both forms, Det. Irizarry asked him, "You understand every little thing that we are, we have said, everything?" to which the Defendant replied, "Si," translated as "Yes."

Det. Irizarry, translating for Det. Massey, then inquired of the Defendant where he had gotten his wounds treated. The Defendant told them that he had gone to Kentucky. The detectives then asked the Defendant, with Det. Irizarry doing so in Spanish, "Why did you go to, to the Sheriff's Department tonight?" The Defendant replied (in Spanish, as translated), "I went because I committed something that . . . I did something that wasn't . . . that wasn't all right." Det. Irizarry explained, "That's why we're here, and, we want to talk about what happened, [U.I.] over there. [U.I.] we want to see if you can help us clarify some of the things . . . about some events that happened . . . " The detectives then asked if the Defendant wanted anything to eat. The Defendant declined. Det. Irizarry then continued: "You mentioned that you did, committed something that wasn't all right?" The Defendant responded, "Umm. . ., yes, I did something that wasn't all right." Det. Irizarry asked, "What did you do that wasn't all right?" The Defendant said, "Umm. . ." Det. Irizarry said, "That's why we're here, you know, to, to, to hel. . ., to understand what happened and, and we're here all together and, and I know that it's a little hard, but relax and calm down and we're going to, to work through this, [U.I.]" The Defendant replied, "Since that, since you just finished reading me the, that paper . . ." to which Det. Irizarry said, "Yes. . ." and the Defendant continued, "I can do it alone, but I'd like to be helped, I'd like for you to provide me with a lawyer. . ." Det. Irizarry asked, "You want a lawyer? I mean, do you want a lawyer?" The Defendant stated, "Yes, I want a. . ." The detectives then ended the interview.

The Defendant testified at the suppression hearing and stated he thought that by signing the forms, he was requesting an attorney. The Defendant also stated that there was some discussion while the tape recorder was turned off. Det. Irizarry strenuously denied this. At the conclusion of the suppression hearing, the trial court ruled as follows:

> I've listened, I have read the transcript that's been prepared by experts, the documentation of waivers have been signed. I've heard the testimony of the detective, testimony of the defendant, and with all that in mind, the real question I have to say to me is, after reading this and listening to this, did the defendant voluntarily and knowingly waive his constitutional rights under the Fifth Amendment and make a statement? I don't believe it could be any clearer in the transcript that he was told he had these rights. I believe by his response he understood them. He did exercise his right under the Fifth Amendment, he cut the questioning off, said he had been advised he could do so. He exercised that right, all questions ceased.
> . . .

The Court is going to allow the statement to be admitted up to the point that he exercised his right and the questioning ceased.

The Defendant now claims that the trial court erred because "[t]he Spanish Miranda warning read to [him] left off the fact that [he] could request an attorney before being questioned by police."

We will uphold a trial court's findings of fact in a suppression hearing unless the evidence preponderates otherwise. See State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, our review of a trial court's application of law to the facts is conducted under a de novo standard of review. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

In the seminal case of Miranda v. Arizona, the United States Supreme Court held that, before a suspect may be subjected to custodial interrogation by law enforcement, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. Miranda does not, by its own terms, require that a suspect be advised specifically that he has the right to the presence of an attorney "before questioning." The Defendant has not cited us to any case so holding. We are aware of none.

After being advised of his rights, a suspect may waive them and proceed to talk to the inquiring officers. The suspect's waiver will be upheld, and his subsequent statements admitted into evidence, so long as the suspect's waiver was made "voluntarily, knowingly and intelligently." Id.

As the recited passages from the Defendant's interview make clear, the Defendant was fully advised of his Miranda rights in his native tongue. The Defendant indicated that he understood these rights. The Defendant then agreed to waive these rights, voluntarily, knowingly and intelligently. Shortly thereafter, the Defendant made the statement, "I did something that wasn't . . . that wasn't all right." As noted by the trial court, the Defendant then actually exercised his rights, making clear beyond peradventure that he understood them. We see no error by the trial court in concluding that the Defendant's statement was admissible. This issue is without merit.

### B. Vienna Convention

The Defendant also claims that his statement should have been suppressed because the State allegedly failed to comply with Article 36 of the Vienna Convention. That Article provides, in pertinent part:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:[4]
. . .

---

[4] In the context of Article 36 as it arguably applies to this case, the "sending State" is Mexico and the "receiving State" is the United States.

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph[.]

Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820, 596 U.N.T.S. 261. The record indicates that the State did not notify the Mexican Consulate about the Defendant's arrest until November 2001.

The Defendant cites us to no authority requiring the suppression of evidence under the circumstances of his case. To the contrary, the United States Court of Appeals for the Sixth Circuit has held that "although some judicial remedies may exist, there is no right in a criminal prosecution to have evidence excluded or an indictment dismissed due to a violation of Article 36." United States v. Page, 232 F.3d 536, 540 (6th Cir. 2000). See also United States v. Li, 206 F.3d 56 (1st Cir. 2000); United States v. Lombera-Camorlinga, 206 F.3d 882, 888 (9th Cir. 2000); United States v. Cordoba-Mosquera, 212 F.3d 1194, 1196 (11th Cir. 2000). No Tennessee court has interpreted Article 36 so as to give a foreign national the right to suppress evidence upon a violation thereof. We decline to be the first to do so. This issue is without merit.

## III. ADMISSIBILITY OF HEARSAY

In his third and final issue, the Defendant contends that the trial court erred in allowing Ms. Myatt to testify about what Ms. Nelson said during their final phone call. Specifically, Ms. Myatt testified as follows:

I was in bed and I reached over to answer the telephone. And I said, hello. And she said, Margaret you've got to help me. And I can remember raising up, because I had never heard anybody sound so scared and all at once I heard her scream. Then she said, Jose stop, you're going to kill me. And she screamed some more, and she said again, Jose stop you're killing me, then I heard a thud and didn't hear anything else.

The Defendant argues that the admission of these hearsay statements by the deceased violated his constitutional rights under the Confrontation Clause. See U.S.Const. Amend. VI. The Defendant relies on the recent decision of Crawford v. Washington, 541 U.S. 36 (2004), in support of his argument. The State contends that Crawford does not require the exclusion of the statements and that they were was properly admitted as an "excited utterance." See Tenn. R. Evid. 803(2).

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This right is also protected by the Tennessee Constitution. See Tenn. Const. Art. I, § 9. In

Crawford, the United States Supreme Court considered the admissibility of testimonial hearsay and concluded that such evidence is prohibited by the Confrontation Clause unless 1) the declarant is unavailable to testify at trial and 2) the defendant had a previous opportunity to cross-examine the declarant. 541 U.S. at 68. The Court declined to formulate a comprehensive definition of "testimonial," but explained that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id. Particular hallmarks of testimonial hearsay are statements made to government officials where there is a reasonable expectation that the statement may be used prosecutorially. See id. at 51-52. The Court further concluded, however, that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." Id. at 68 (emphasis added).

The victim's hearsay statements in this case were admitted under the "excited utterance" exception to the hearsay rule. See Tenn. R. Evid. 803(2). An "excited utterance" is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Id. As a panel of this Court has recently noted,

> The rationale for admitting an "excited utterance" is that the perceived event produces nervous excitement, which temporarily suspends the capacity to reflect, making the fabrication of statements about that event unlikely. . . . In addition, a statement relating to a startling event is typically made while the memory of the circumstance or event is still fresh, thus creating a more accurate testimonial to the event than would be produced by a later in-court description of it.

State v. Michael Lebron Anderson, No. E2004-00694-CCA-R3-CD, 2005 WL 171441, at *2 (Tenn. Crim. App., Knoxville, Jan. 27, 2005) (citing State v. Gordon 952 S.W.2d 817, 819-20 (Tenn. 1997)). In the Anderson case, the defendant challenged the admission of an excited utterance under Crawford. This Court determined that a statement which meets the definition of an excited utterance "do[es] not fit into any of Crawford's core testimonial categories." 2005 WL 171441, at *4. Rather,

> the essential characteristics that cause [such] statements to fall within the ambit of the excited utterance exception conflict with the characteristics that would make them testimonial. The underlying rationale for the excited utterance exception is that the perceived event produces nervous excitement, making fabrication of statements about that event unlikely. Because an excited utterance is a reactionary event of the senses made without reflection or deliberation, it cannot be testimonial in that such a statement has not been made in contemplation of its use in a future trial.

Id. Thus, this Court concluded that the challenged statements were nontestimonial and not prohibited by the Confrontation Clause as construed in Crawford. See id.

-13-

This panel of the Court agrees with the analysis of this issue set forth in the <u>Anderson</u> decision. Accordingly, if we conclude that Ms. Nelson's statements to Ms. Myatt were excited utterances, then <u>Crawford</u> does not avail the Defendant.

As made clear by its definition, a hearsay statement will be deemed an excited utterance where 1) there has been a startling event or condition that causes the stress of excitement; 2) the statement relates to the startling event or condition; and 3) the statement was made while the declarant was under the stress or excitement of the event or condition. <u>See</u> <u>State v. Stout</u>, 46 S.W.3d 689, 699-700 (Tenn. 2001). We have no trouble concluding that Ms. Nelson's statements to Ms. Myatt meet these criteria. Ms. Nelson made the statements while under the brutal attack that would end her life. Such an assault qualifies as a startling event that causes the stress of excitement. Ms. Nelson's statements also unquestionably related to the event, and were made during the duress of her dying moments. Indeed, it is hard to imagine a statement that would more emphatically meet the definition of "excited utterance."

Whether or not a hearsay statement is admissible through an exception to the hearsay rule is a determination left to the sound discretion of the trial court. <u>See</u> <u>State v. Stinnet</u>, 958 S.W.2d 329, 331 (Tenn. 1997). In this case, the trial court committed no error in ruling Ms. Nelson's statements admissible under the excited utterance exception to the hearsay rule. As set forth above, their admission did not violate the Defendant's rights under the Confrontation Clause. Accordingly, this issue is without merit.

## CONCLUSION
We affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE