Filed 10/27/14  P. v. Arteaga CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROMAN ARTEAGA,<br><br>    Defendant and Appellant. | F066140<br><br>(Super. Ct. No. BF137123A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Harry Joseph Colombo, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Following a jury trial, defendant Roman Arteaga was convicted on three felony counts: one count of engaging in sexual intercourse or sodomy with a child 10 years old or younger in violation of Penal Code section 288.7, subdivision (a),[1] (count 1), and two counts of engaging in oral copulation or sexual penetration of a child 10 years old or younger in violation of section 288.7, subdivision (b), (counts 2 & 3). Defendant was found not guilty on counts 4 and 5 for the felony offenses of committing a lewd or lascivious act with a child under the age of 14 in violation of section 288, subdivision (a), but was found guilty of the lesser included offense to each count, battery, a violation of section 243, subdivision (a).[2]

On appeal, defendant contends his convictions in counts 1, 2 and 3 should be reversed because (1) police violated his constitutional rights by coercing him into making incriminating statements; (2) the trial court committed prejudicial error by instructing the jury that sexual penetration under section 288.7 is a general intent crime; and (3) as a Mexican national, he should have been advised, upon his arrest and prior to his interrogation, of his right to seek advice and representation from the Mexican Consulate under the Vienna Convention and, since he was not, his statements should have been suppressed or he should have been given the right at trial to consult with consular officials regarding his case.

We hold: (1) the police did not coerce defendant into making involuntary incriminating statements; (2) although the trial court committed instructional error regarding section 288.7, subdivision (b), the error was not prejudicial; and (3) defendant

---

[1]    All statutory references are to the Penal Code unless otherwise noted.

[2]    Regarding counts 4 and 5, defendant was also found guilty of an enhancement for committing an offense against more than one victim under section 667.61, subdivision (e)(4). The prosecution dismissed these enhancements following the verdicts.

cannot use the Vienna Convention to suppress his statements to police and reverse his convictions. Accordingly, we affirm.

## BACKGROUND

### I. Prosecution evidence

#### A. Counts 1 and 2 – Di.[3]

The jury convicted defendant on counts 1 and 2, which involved defendant's granddaughter, Di.

When she was eight or nine years old, Di. and her sister, Da., rode with defendant in his car in Bakersfield. Defendant dropped off Da. at one corner and drove Di. to another corner. Defendant told Di. to pull down her pants but she refused. He then got into the backseat where Di. was, pulled down her pants, and removed her underwear. Defendant lay on top of Di. and put his penis inside her vagina, which she felt "a little" inside her and "it was kind of in there." Defendant then got up, and told Di. to pull up her pants. When she sat up, Di. saw "white stuff" on the seat of the car in one spot next to her. Defendant returned to the front seat of the car and drove back to where he had left Da. and picked her up.

About a year later, when she was about 10 years old, Di. went into defendant's residence to retrieve a bicycle. Defendant directed her to a room, followed her, and, once in the room, removed her pants and licked her vagina. This did not last "very long" and Di. then went outside.

Di. did not tell anyone about these two incidents because she was embarrassed and afraid.

---

**3** In this opinion, certain persons are identified by initials in accordance with our Supreme Court's policy regarding protective nondisclosure. No disrespect is intended.

**B. Count 3 – Da.**

The jury convicted defendant on count 3, which involved Da., defendant's granddaughter.

Da. rode with defendant and her sister, Di., in Bakersfield. Da. is a year older than Di. Defendant dropped her off at a street corner and drove away with Di. Da. was scared and did not know when defendant was going to return, or where he was going. Defendant then returned and dropped off Di. Defendant drove off with Da. He had her sit on his lap while he drove. Defendant asked Da. if he could touch her. She did not know what he meant, but she told him no. Defendant then drove back to the street corner, picked up Di., and they went home.

Sometime later, Da. was at defendant's residence at night watching a movie with defendant and her grandmother. They were on a bed in a dark room. Da. lay between her grandparents. Defendant was at the head of the bed and her grandmother was at the foot of the bed with her back to them watching the movie. Defendant placed his hand down Da.'s pants, touched her vagina and put his finger into her vagina. Da. attempted to take out defendant's finger by pulling his hand out of her pants, but she was not strong enough to do so. She did not say anything out loud to alert her grandmother. Defendant then took her hand and made her reach inside his pants so that she touched his penis.

After defendant touched her, they finished watching the movie and Da. left without saying anything. Da. never told anyone about this incident because she was afraid of getting into trouble.

**C. Count 4 – De.**

The jury convicted defendant on count 4, which involved De., defendant's granddaughter.

When she was six or seven years old, De. rode with defendant to a store in Bakersfield. Defendant touched her upper left thigh with his right hand for "five minutes" while they were in the car. She tried to move away but was unable to do so

4.

because the door was next to her. When defendant finished he instructed her not to tell her mother. De. was scared while it happened, but she never told anyone about it.

### D. Count 5 – M.

The jury convicted defendant on count 5, which involved M. M. was 12 years old at the time she testified. Her sister is the mother of Di., Da. and De.

When M. was around nine years old, defendant touched her on her vagina and buttocks. This happened more than five times. She did not know if it happened more than 10 times. It happened when M. visited her sister's home. Defendant touched her sometimes over her clothes and sometimes under. He did not touch her on her vagina and her buttocks every time, but one or the other. She stated defendant would "slide it" when describing how he touched her with his hand on her vagina under her clothes and she testified defendant would just "touch it" when asked to describe how he touched her buttocks with his hand.

A little over a year prior to her trial testimony, M. spoke with Detective Caldas and she told him about defendant touching her buttocks but she did not say anything about defendant touching her vagina. She first informed Caldas about defendant touching her vagina the Friday before her trial testimony. M. did not tell Caldas about that at their first meeting because she forgot and was scared.

### E. Detective Caldas's testimony

Caldas interviewed Di., Da. and M. about what happened with defendant. Di. informed him defendant's penis was "erect" when she was with him in the back of his car, and "white stuff" came out onto her vagina. Da. informed him she was nine or 10 years old when defendant digitally penetrated her. Caldas confirmed M. never mentioned defendant touching her vagina when he interviewed her in June 2011, but she remembered it and first told him on September 14, 2012, the Friday before the trial.

Caldas also interrogated defendant, which was recorded, regarding allegations defendant sexually abused his granddaughters. The jury viewed the recording at trial and was provided a copy of the interview transcript.

Caldas used a "ruse" to get "the truth" from defendant when he interrogated him. Caldas incorrectly informed defendant that Di. was medically examined and he implied DNA linked defendant to the criminal allegations. Prior to the ruse, defendant had denied involvement in the alleged activities. Caldas used the DNA ruse because it was a tactic he had used "numerous years" in his assignments and it had worked for him.

Caldas also placed a "religious card"[4] (the Saint Card) (taken earlier from defendant's wallet) on the table in front of defendant. Caldas told defendant he wanted to tell the girls that defendant "had repented for what he did." Defendant then said "lock me up" but continued to deny what had happened. Caldas continued to press defendant, saying words to the effect of, "If you're repenting, I need more information."

## II. Defense evidence

Defendant testified on his own behalf and was the only witness for the defense. He denied engaging in sexual intercourse or oral copulation with Di., and he denied touching Da.'s vagina. He also denied touching De. in a sexual way but admitted he touched or slapped her right knee while he drove her to a store. He denied ever touching M.'s vagina, but recalled a time when the family played soccer, and he fell and "touched her butt."

---

[4] Caldas testified during the Evidence Code section 402 suppression hearing this was a "photograph of the Lady of Guadalupe" but, during the taped interview, Caldas referred to the saint as a "gentleman" and defendant stated it was "Saint Olivio." However, during the trial, Caldas testified it was "a picture of -- it looked like the virgin -- the Virgin Mary." Caldas admitted during trial cross-examination he could not remember at that point whom the card depicted.

Defendant stated all the girls were incorrect in their testimony. When asked why he thought the girls would not tell the truth about what happened, defendant suggested it was his wife who wanted the girls to say these things for unspecified "vengeance."

Defendant testified Caldas "forced" him to make incriminating statements because Caldas lied to him. Defendant stated he was "shaking" and was "very nervous" during the interview, and he was "scared" when Caldas talked about DNA. Defendant said he lied to Caldas because he was pressured and felt fearful.

## DISCUSSION

### I. Defendant's statements to the police

Defendant contends the court erred in denying a motion to suppress the incriminating statements he made to police during custodial interrogation. Defendant argues the detective coerced statements from him by appealing to his religious beliefs and using his lack of education to deceive him as to the nature of DNA evidence.

#### A. Facts from the suppression hearing

The trial court conducted a pretrial hearing under Evidence Code section 402 regarding the admissibility of defendant's statements to Caldas. During the hearing, neither the recording nor the transcript was offered into evidence. The only evidence came from Caldas's testimony. Defendant's counsel, however, referred to the transcript during the hearing when cross-examining Caldas.

Caldas interviewed defendant on June 6, 2011, and he advised defendant of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) before asking incriminating questions. Defendant verbally answered "yes" to each of the *Miranda* advisements, indicated he understood his rights and he agreed to talk. Defendant then made numerous denials before Caldas observed a photograph of a saint in defendant's wallet (the Saint Card), took it out and placed it on the table. Either before or after placing the Saint Card on the table, Caldas made a reference that, if you touch somebody, the DNA stays on them forever. Caldas could not recall whether his DNA comment or

7.

the placing of the Saint Card occurred first without reviewing the recording. Caldas agreed that, prior to this time, defendant had been denying any sexual contact with the girls. Caldas testified that, after placing the Saint Card on the table, defendant stated "I repent" and he began confessing. The hearing then ended.

As to the coercion issue, defendant's counsel argued the use of the Saint Card induced defendant to confess in violation of his constitutional rights. The trial court, however, ruled *Miranda* rights were appropriately given and no coercion took place. In deciding that no coercion occurred, the trial court noted it did not "have enough facts and information" to know whether or not defendant was a religious man or whether showing the Saint Card would affect him in any way. The trial court stated it appeared to be "a typical ruse that officers use during the course of a questioning to get the defendant to say something." The trial court said it did not "see that showing [the Saint Card] to [defendant] was coercive in any way. He saw … the [Saint Card] and then apparently said that I repent and began confessing. [¶] So I find that … Miranda rights were appropriately given at the time, and at least on the information I have in front of me now there was no coercion on behalf of Officer Caldas to the defendant."

## B. <u>Facts from the recording and transcript</u>

On appeal, defendant references the transcript and portions of the recording not in evidence during the hearing to support his argument his statements were inadmissible due to references to religion and the lie about the DNA evidence. In a footnote, respondent asks us to disregard this evidence because it was not before the trial court during the hearing. Respondent argues that "'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' [Citation.]" (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) "A defendant cannot challenge a lower court's ruling and then 'augment the record' with information not presented to (or withheld from) the lower court." (*People v. Brown* (1993) 6 Cal.4th 322, 332.)

8.

Defendant counters that, even if the transcript and recording were not admitted into evidence at the hearing, the trial court was aware of the transcript and the recording and failed in its duty to fully explore the issue and consider all circumstances surrounding the interrogation. In addition, defendant claims this court must undertake an independent review of the evidence to determine if defendant's constitutional rights were violated.

We need not determine if our review is limited solely to the testimony presented at the hearing or if it includes the recording and transcript because, under either method of review, defendant's claim is meritless.[5]

Shortly after starting the recording of defendant's interview, Caldas left the room to get a cup of water for defendant. While Caldas is off screen (and presumably out of the interview room), defendant "crossed himself." There is no evidence Caldas saw defendant cross himself.

After returning, and prior to advising defendant of his rights under *Miranda*, Caldas asked him for his social security number, defendant stated he did not know it, and began to search through his wallet. Caldas asked defendant for his wallet. After defendant handed it to him, Caldas searched it. In doing so, Caldas located the Saint Card and asked about it. Defendant indicated it depicted a saint. Caldas almost immediately set the Saint Card aside away from defendant and he continued to search through defendant's wallet.

Caldas then advised defendant of his rights under *Miranda*. Defendant indicated he understood his rights and he agreed to talk. At no time did defendant ask for a lawyer or invoke his right to silence.

---

[5] We express no opinion regarding defendant's contention the trial court failed in its duty to review the recording and transcript during the hearing despite defendant's failure to offer them into evidence.

Caldas informed defendant he wanted the truth and stated "sometimes we make mistakes …. [¶] … [¶] … because of alcohol" and he wanted defendant's granddaughters to understand "that their grandfather didn't do it on purpose." Defendant said it was okay to talk.

When first asked, defendant stated the girls were lying about the allegations. Caldas then informed defendant, "… I know that you sexually abused [Di.]. What I don't know is why? I don't know if you were a little drunk. I don't know if you were a little drugged up. Or if you really need help and these are one of those things that one can't control." Defendant only responded with "Uh huh."

Caldas then used the "ruse" and informed defendant Di. had been examined and DNA stays on a person's body "forever." Caldas implied defendant's DNA had been discovered based on a match to defendant's fingerprint. Caldas then informed defendant, "I know you did it. Okay?" Defendant said something unintelligible and Caldas told him to "stop the lies."

Caldas then stated, "I want to go to the little girls and tell them, 'You know what, [defendant] promised, told the truth and repented from what he did.'" At or about the same time, Caldas moved the Saint Card in front of defendant and tapped it once with his closed fist to emphasize his statement. Defendant then crossed himself, appeared to start crying and stated, "Okay." Caldas then asked, "Okay[,] what happened?" Defendant stated, "I just got her like this" (touching his right leg/thigh) and "That was all." Defendant then indicated he "asked for forgiveness" and he stated, "May God forgive me." Defendant then asked Caldas to "lock me up." Caldas, however, informed defendant he first needed to state what happened.

Caldas then confronted defendant about touching Da.'s vagina, which defendant denied. Caldas said, "Okay, if you are really repenting of this, I need the truth my son." Defendant stated, "It's fine, it's fine, if I touched her, I'm sorry, I was drunk too." Caldas then asked defendant why he touched her, and defendant answered, "I don't know what

10.

happened. She was hugging me like this but I don't know. I don't understand them. But, by no means. Forgive me and may God forgive me and you give me what you're going to give me."

Caldas then informed defendant he had not told him anything and "right now I can't tell the girls that you have been honest." Caldas again asked defendant why he touched Da.'s vagina and defendant answered, "I didn't, I didn't (unintelligible) I was drunk that day." Defendant then demonstrated to Caldas how he touched Da.'s vagina by touching around his groin area. Caldas later asked defendant how much of his finger went inside Da.'s vagina and defendant answered, "No[,] it was just like this. [¶] … [¶] … Like this but outside."

Regarding Di., defendant stated she got on top of him while he was lying face up and he told her, "'Get off.'" Defendant stated Di. got on top of him but they did not have sex. He told Caldas, "No, she's my granddaughter. I was very drunk."

Caldas questioned defendant about the incident with Di. in the car and asked if she was flirting; defendant answered, "Yes, she was. She was. [¶] … [¶] … She would tell me to give it to her, to give it to her and I told her no, no mama." After being questioned, defendant stated Di. took off her pants, sat on him and told him "to give it to her" and he told her "'No.'" Defendant denied his penis entered into Di.'s vagina "because it doesn't work." He told Caldas he did not take out his penis but it was Di. who did so and she "would sit on it" but it did not stand up. Caldas denied ejaculating and denied putting sperm inside Di.'s vagina but he said "… I just felt a little bit wet but it was inside my underwear."

Caldas asked him about touching M.'s buttocks, and defendant stated he said, "'Run [M.]'" and "hit her" while they were playing soccer.

## C. Standard of review

"Any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion is inadmissible pursuant to the Fourteenth Amendment to the federal

11.

Constitution and article I, section 7 of the California Constitution." (*People v. Dykes* (2009) 46 Cal.4th 731, 752.) To determine whether a confession is voluntary, courts examine """"whether a defendant's will was overborne""" by examining all of the circumstances surrounding the confession. (*Ibid.*) "In making this determination, courts apply a 'totality of the circumstances' test, looking at the nature of the interrogation and the circumstances relating to the particular defendant." (*Ibid.*; *People v. Haley* (2004) 34 Cal.4th 283, 298.) Among the factors to examine are """"the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.""" (*People v. Massie* (1998) 19 Cal.4th 550, 576.)

"'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.'" (*People v. Linton* (2013) 56 Cal.4th 1146, 1176, quoting *People v. Carrington* (2009) 47 Cal.4th 145, 169.) "'On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence.'" (*People v. Linton, supra,* at pp. 1176-1177, quoting *People v. Williams* (2010) 49 Cal.4th 405, 425.) "The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review." (*People v. Linton, supra,* at p. 1177, citing *People v. McWhorter* (2009) 47 Cal.4th 318, 346.)

### D. Caldas's references to religion were permissible

Defendant relies on the holding from this court in *People v. Adams* (1983) 143 Cal.App.3d 970 (*Adams*), disapproved on other grounds in *People v. Hill* (1992) 3 Cal.4th 959, 995, footnote 3, for the proposition his statements to Caldas were involuntary because of religion. This reliance is misplaced.

12.

In *Adams*, the police interviewed the defendant several times concerning her claim that several unidentified assailants murdered her boyfriend. The sheriff, who knew her from church and her employment at a Christian bookstore, then spoke with her alone and told her he did not believe her story based on the physical evidence and her behavior. The sheriff knew the defendant was suffering from nervousness and was having difficulty sleeping. The sheriff suggested to the defendant she was having a difficult time telling the truth because of their prior relationship through the church. (*Adams, supra,* 143 Cal.App.3d at p. 979.) He reassured her he would not judge her or think of her as un-Christian and explained to her "there was accountability attached to her actions, that [the defendant] knew this as a Christian, and should she continue to deny accountability for what he believed she had done, she would continue to have problems in experiencing more guilt." (*Ibid.*) The sheriff quoted Bible verses indicating "'God is a merciful God'" (*ibid.*), but disregarding God's rules would cause God to turn his back on that individual, who would suffer some form of retribution. (*Id.* at p. 980.) The sheriff referred to a book written by a minister which included a description of a young woman in a mental institution suffering from a "'sin factor'" arising from guilt. He told the defendant he believed her situation was similar, suggesting she could end up in a mental institution. (*Ibid.*) The defendant indicated her story might not be true, but stated she did not want to spend the rest of her life in jail. The sheriff responded that only a judge could determine the sentence but explained some people received sentences of only "'four to seven years'" (*id.* at p. 981) for killing another person. The defendant then admitted she had been lying and directed officers to the murder weapon.

*Adams* agreed the cumulative effect of the sheriff's reliance on his friendship with the defendant, his knowledge and use of her religious beliefs, and his suggestion she might end up in a mental institution if she did not tell the truth rendered her admissions involuntary. (*Adams, supra,* 143 Cal.App.3d at pp. 983, 986, 989.) *Adams* noted "the totality was not purely intellectual persuasion, but an overwhelming and calculated

13.

appeal to the emotions and beliefs, focusing [the defendant's] fears in an area the sheriff knew [the defendant] to be particularly vulnerable." (*Id.* at p. 986.)

Here, defendant's argument Caldas knew defendant to be particularly vulnerable and used religion as the mechanism through which he manipulated defendant into making admissions is without merit. Unlike the sheriff in *Adams*, there is no evidence Caldas was acquainted with defendant, let alone had a prior friendship based on attending the same church. Further, it is pure speculation Caldas "may have seen [defendant] crossing himself when left in the room alone prior to the start of the interrogation." Even if, arguendo, Caldas saw defendant cross himself before he found the Saint Card, Caldas's brief reference to religion, by itself, is not an impermissible coercive technique. (*People v. Kelly* (1990) 51 Cal.3d 931, 951-953 [permissible for officer who learned suspect was Christian to tell suspect his actions violated Christian upbringing along with state law and everything else].)

Caldas's brief religious references were not pervasive as in *Adams* and, unlike the sheriff in *Adams*, Caldas did not quote bible verses. Unlike the sheriff in *Adams*, Caldas neither suggested defendant's failure to confess would result in a mental health commitment nor did he suggest defendant would receive a leniently short sentence. Unlike the sheriff in *Adams*, Caldas did not attempt to lecture defendant about God's law, sin, guilt or a "'reprobate mind.'" (*Adams, supra,* 143 Cal.App.3d at pp. 979-980 & fn. 8.) Caldas did not assume the role of a priest or a spiritual advisor, as defendant contends, but simply sought information while speaking in a quiet tone and without lecturing defendant about God.

Caldas did not place his hand on the Saint Card like he was "swearing" on a Bible as defendant argues, but rather he tapped it once with his closed fist after stating he wanted to tell the granddaughters that defendant told the truth and repented. Caldas used defendant's granddaughters, as much if not more than any reference to religion, as the mechanism to elicit defendant's statements, and his infrequent use of the words "repent"

14.

or "repented" appeared less associated with religion than a general plea for defendant to confess his crime.[6]

Caldas's brief reference to religion was not "an overwhelming and calculated appeal" to defendant's emotions and beliefs in an area Caldas knew defendant was vulnerable. (*Adams, supra,* 143 Cal.App.3d at p. 986.) *Adams* is distinguishable and does not control.

Instead, Caldas's brief reference to religion was an exhortation to tell the truth. Exhortations to tell the truth, unaccompanied by either a threat or a promise, do not render defendant's statements involuntary. (*People v. Carrington* (2009) 47 Cal.4th 145, 174, 176 [detective's statement "'there's someone up above, bigger than both us looking down saying Celeste, you know that you shot that person … and it's time to purge it all'" was not calculated to exploit religious beliefs].) When defendant denied certain allegations, Caldas stated, "Okay, if you are really repenting of this, I need the truth[,] my son." When defendant further continued to deny specific allegations, Caldas told him he thought he was lying, and it was important to tell the truth because "right now I can't tell the girls that you have been honest." There was nothing impermissible about Caldas's comments. (*People v. Hill* (1967) 66 Cal.2d 536, 549 [nothing improper where benefit mentioned by the police is merely that which flows naturally from a truthful and honest course of conduct].)

Moreover, defendant resisted whatever psychological pressure Caldas employed in appealing to his feelings about his family and seeking forgiveness because he continued to deny engaging in certain conduct, such as removing Di.'s pants, touching Da.'s vagina,

---

[6] The first definition of "repent" is "[t]o feel remorse, contrition, or self-reproach for what one has done or failed to do; be contrite." (American Heritage Dict. (4th ed. 2006) p. 1479.)

15.

and having sex with Di. This suggests defendant's will was not immediately overborne because of religion.

As such, the trial court properly denied defendant's motion to suppress based on the evidence before it and, even when the entire record is reviewed to include evidence not considered during the hearing, defendant's statements were not coerced by references to religion.

### E. Caldas's misrepresentation about DNA was permissible

Defendant also contends the court should have excluded his statements to Caldas because Caldas capitalized on his lack of education and ignorance regarding modern science "to trick" him into "thinking that DNA evidence conclusively established his guilt." He further argues Caldas tied the DNA deception to an appeal to his religious beliefs and, under the totality of the circumstances, this successfully overbore his will.

"Lies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession, but they are not per se sufficient to make it involuntary." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240.) "Where the deception is not of a type reasonably likely to procure an untrue statement, a finding of involuntariness is unwarranted." (*People v. Farnam* (2002) 28 Cal.4th 107, 182 [fabricated evidence of fingerprints on a wallet alone not of type reasonably likely to procure an untrue confession]; *People v. Thompson* (1990) 50 Cal.3d 134, 167 [officers repeatedly lied, insisting they had forensic evidence linking the suspect to a homicide]; *In re Walker* (1974) 10 Cal.3d 764, 777 [confession found voluntary where wounded defendant was told, perhaps deceptively, that he might die before reaching the hospital and that he should talk to close the record].)

Here, while scientific evidence can be persuasive, defendant failed to demonstrate the DNA deception was "reasonably likely to procure an untrue statement." (*People v. Farnam, supra,* 28 Cal.4th at p. 182.) There is no substantive difference in coerciveness between the untrue DNA evidence here and falsified fingerprints and forensic evidence

16.

the Supreme Court has found unlikely to prompt a false confession. (*Id.* at p. 182 [fabricated fingerprints on a wallet]; *People v. Musselwhite, supra,* 17 Cal.4th at p. 1241 [fingerprints falsely said to have been lifted from victim's neck]; *People v. Thompson, supra,* 50 Cal.3d at p. 167 [lie police had found soil samples, car tracks and rope fibers connecting suspect to murder did not invalidate confession].)

Defendant further argues the deception worked because Caldas knew defendant only had a second grade education in Mexico, had been raised by a series of relatives after his parents' death, had a very hard youth "'washing cars, cleaning windows,'" and now worked as a field laborer and recycler. However, defendant is incorrect Caldas testified he used the DNA ruse "because he knew [defendant] had very little education." To the contrary, Caldas testified he did not use the ruse based on defendant's level of education, but, rather, because it was a tactic he had used "numerous years" and it had worked well for him. Further, while defendant may have had a hard childhood, he was born in 1960 and there is no evidence to suggest he lacked maturity or had mental health issues that allowed him to be easily coerced. There is also nothing about the length of the single interrogation, lasting just under 39 minutes, or its location, to raise concerns.

The combination of the DNA deception and the religious references "under the totality of the circumstances" did not successfully overbear defendant's will. Even after Caldas used the DNA deception, and then the brief references to religion, defendant continued to deny certain conduct, which suggests his will was not overborne by these factors either separately or in combination. In any event, Caldas's tactic never resulted in defendant unequivocally admitting the allegations.

Under the totality of all the circumstances, taking into consideration both the characteristics of the accused and the details of the interrogation, defendant's statements to Caldas were voluntary and not coerced.

## II.    Instructional error

The court instructed the jury that defendant was charged in count 3 with "engag[ing] in an act of … sexual penetration … with Da." in violation of section 288.7, subdivision (b).  Such crime is committed when any person 18 years of age or older "engages in … sexual penetration, as defined in Section 289, with a child who is 10 years of age or younger …."  (*Ibid.*)

Defendant contends that, as to count 3, the trial court prejudicially erred in giving the instruction on general intent (CALCRIM No. 250).  Defendant argues the court's purported failure to instruct on specific intent requires reversal of his conviction.

### A.  Duty to instruct

"'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.'"  (*People v. Anderson* (2011) 51 Cal.4th 989, 996, quoting *People v. Martinez* (2010) 47 Cal.4th 911, 953.)  "A trial court's duty is not always adequately performed by merely reading to the jury the wholly correct requested instructions; it is that court's duty to see to it that the jury are adequately informed on the law governing all elements of the case submitted to them to an extent necessary to enable them to perform their function in conformity with the applicable law.  [Citations.]" (*People v. Sanchez* (1950) 35 Cal.2d 522, 528.)

### B.  The instruction given

The court instructed the jury using CALCRIM No. 250, which he read to them as follows:

> "The crimes charged in this case requires [*sic*] the proof of the union or joint operation of act and wrongful intent.  For you to find a person guilty of the crimes in this case in Counts 1, 2 and 3 and the lesser crime of battery, that person must not only commit the prohibited act but must do so with wrongful intent.

18.

"A person acts with wrongful intent when he or she intentionally does a prohibited act. However, it does not require that he or she intend to break the law. The act required is explained in the instruction for that crime, which I'll give you in a moment."

As to count 3, the court did not instruct the jury using CALCRIM No. 251 that, in order to find defendant guilty, he must have done the act with specific intent.[7]

The terms "specific intent" and "general intent" differ in that, "'"When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is [general intent]. When the definition refers to a defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent."'" [Citation.]" (*People v. Ford* (1983) 145 Cal.App.3d 985, 989.)

We agree with defendant's assertion that section 288.7, subdivision (b), when violated by an act of sexual penetration, is a specific intent crime. Sexual penetration requires that defendant committed the act of penetration of the victim's "genital or anal opening *for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object.*" (§ 289, subd. (k)(1), italics added; accord *People v. Ngo* (2014)

---

**7** The trial court's instruction with respect to CALCRIM No. 251 was as follows: "The crimes and/or other allegations charged in this case require the proof of the union or joint operation of act and wrongful intent.… [¶] … [¶] … For you to find the person guilty in the crimes in this case of Counts 4 and 5 and the lesser of attempt, or to find the allegations true, the person must not only intentionally commit the prohibited act or intentionally fail to do the required act, but must do so with the specific intent and/or mental state. [¶] The act and specific intent and/or mental state required are explained in the instructions for that crime or allegation."

19.

225 Cal.App.4th 126, 157.) Thus, the trial court erred in not including count 3 in its CALCRIM No. 251 instruction.

### C. **The error was harmless because of CALCRIM No. 1128**

The California Supreme Court has held that """"every kind"""" of jury instructional error, including """"incorrect, ambiguous, conflicting, or wrongly omitted instructions""""" can equally """""misdirect""""" a jury and, thus, falls under the California constitutional test for reversible error. (*People v. Breverman* (1998) 19 Cal.4th 142, 173.) A trial court's mistaken instruction to a jury that a crime required only a general intent, rather than a specific intent, is subject "'to harmless error analysis [when] it appears beyond a reasonable doubt that the error did not contribute to [the] jury's verdict.'" (*People v. Haley*, *supra*, 34 Cal.4th at p. 314, quoting *People v. Flood* (1998) 18 Cal.4th 470, 504.) Further, an instruction "that omits a required definition of or misdescribes an element of an offense is harmless only if 'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."' [Citation.] 'To say that an error did not contribute to the verdict is … to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 774.)

However, any claim of instructional error requires examination of the jury instructions as a whole. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) Further, jurors are presumed to be sufficiently capable of understanding and "'correlating'" all jury instructions given. (*Ibid.*)

The error in this case was, however, harmless because the court later instructed the jury using CALCRIM No. 1128 to define section 288.7, subdivision (b), in relevant part as follows:

20.

"Defendant is charged in Counts 2 and 3 with engaging in oral copulation or sexual penetration with a child under ten years of age or younger, in violation of Penal Code Section 288.7, sub (b).

"To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant engaged in an act of oral copulation, which is Count 2, against [Di.], *or sexual penetration, which is Count 3 with [Da.].* [¶] … [¶]

"Sexual penetration is penetration however slight of the genitalia or anal opening of the other person or causing the other person to penetrate, however slightly, the defendant or someone else's genital or anal opening or causing another person to penetrate, however slightly, his or her own genital or anal opening by any foreign object, substance, instrument, device or any unknown objection [*sic*] *for the purpose of sexual arousal, abuse or gratification.*

"*Penetration for sexual abuse means penetration for the purpose of causing pain, injury or discomfort.*

"An unknown object includes any foreign object, substance, instrument or device, or any part of the body, including a penis, if it is not known what object …. [¶] … penetrated the opening.

"A foreign object, substance, instrument or device includes any part of the body except a sexual organ." (Italics added.)

Even though the court did not give a separate instruction informing the jury the crime of sexual penetration required a finding of specific intent, the court, by giving CALCRIM No. 1128, in effect, instructed such a finding was required. Since the jury here was actually told sexual penetration must have the purpose of sexual abuse, arousal or gratification, there was no danger defendant could have been convicted for sexual penetration of Da.'s genitals absent a purpose of sexual arousal, abuse or gratification.

Considering the instructions as a whole, we conclude the trial court's error in referring to count 3 as a general intent crime, rather than a specific intent crime, was harmless as it was "'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" (*People v. Mayfield, supra,* 14 Cal.4th at p. 774.)

21.

**D. Prejudice is not present from a missing voluntary intoxication defense**

Defendant argues prejudice occurred from the trial court's instructional error because he was "precluded from raising the issue of his voluntary intoxication, a factor which potentially would have had a major effect on the jury's verdict on count three." Defendant correctly points out the jury instruction conference was not memorialized in this matter. As such, defendant contends it is impossible to know if defense counsel objected to the erroneous instruction or requested others, including a voluntary intoxication instruction as to count 3. As a result, defendant claims prejudice is present and he is entitled to reversal of his conviction on count 3. Defendant's claim lacks merit.

Trial courts are not required to give sua sponte instructions regarding the actual effect of the defendant's voluntary intoxication on his relevant mental state, such as specific intent, premeditation, or deliberation. (*People v. Lewis* (2001) 25 Cal.4th 610, 650; *People v. Ervin* (2000) 22 Cal.4th 48, 90.) An instruction on voluntary intoxication is deemed a pinpoint instruction which courts are required to give on request. (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.) However, a defendant is entitled to an instruction on voluntary intoxication "'only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent."' [Citations.]" (*Ibid.*)

Here, it was clear the defense theory at trial was defendant never sexually touched Da. (or any of the victims) and she, along with the others, were not telling the truth. At no time did defendant testify he touched Da., but was inebriated. Despite defendant's argument to the contrary, a voluntary intoxication instruction would have conflicted with the defense theory of the case. Moreover, such an instruction would properly have been refused because defendant never testified intoxication affected his actual formation of specific intent to sexually penetrate Da. As such, defendant has not shown prejudice due to instructional error.

22.

### III. Vienna Convention

Defendant argues he was denied his rights under the Multilateral Vienna Convention on Consular Relations and Optional Protocol on Disputes, April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820 (hereafter Vienna Convention). It is undisputed defendant was never informed of his rights under the Vienna Convention nor was he given the opportunity to consult with his consulate.

The Vienna Convention's article 36 requires signatory nations to advise every arrested foreign national that he or she has the right to have his or her national consulate notified of the arrest and the right to communicate with his consular post. (21 U.S.T. at p. 101; *People v. Corona* (2001) 89 Cal.App.4th 1426, 1429 (*Corona*).) Defendant contends that, as a result of this failure, either his statements to Caldas should have been suppressed or he should have been given a right at trial to consult with consular officials regarding his case. Thus, defendant asserts, his convictions should be reversed.

The Vienna Convention is a 79-article, multilateral treaty signed by the United States and Mexico (among other nations), and ratified by the United States Senate in 1969. (*U.S. v. Lombera-Camorlinga* (9th Cir. 2000) 206 F.3d 882, 884, cert. den. *sub nom. Lombera-Camorlinga* (2000) 531 U.S. 991 (*Lombera-Camorlinga*); *Corona, supra,* 89 Cal.App.4th at p. 1428.) Its provisions cover a number of issues requiring consular intervention or notification, including the death of a foreign national, the crash of a foreign airplane, and the arrest or detention of a consular officer. (*Lombera-Camorlinga, supra,* 206 F.3d at p. 884; *Corona, supra,* at pp. 1428-1429.) Article 36 deals with what a member state must do when a foreign national is arrested and it provides in relevant part: "1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State: [¶] … [¶] (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication

addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph." (21 U.S.T. at pp. 100-101; *Corona, supra,* 89 Cal.App.4th at p. 1429.)

However, the Vienna Convention does not link consular notification to police interrogation or require officials to halt an interrogation if the arrested foreign national invokes his rights under article 36. (*Corona, supra,* 89 Cal.App.4th at p. 1429, citing *Lombera-Camorlinga, supra,* 206 F.3d at p. 886.) Significantly, and as defendant agrees, suppression of illegally obtained evidence is not an appropriate remedy for violation of an arrested foreign national's rights under article 36 of the Vienna Convention. (*Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331, 350; *Lombera-Camorlinga, supra,* at p. 885; *Corona, supra,* at pp. 1429-1430.) Suppression of illegally obtained evidence is a "uniquely" American right that was not contemplated as a remedy for a violation of article 36 by the signatories to the Vienna Convention. (*Corona, supra,* at p. 1429; *Sanchez-Llamas v. Oregon, supra,* at pp. 343-344.) Thus, defendant cannot use the Vienna Convention to suppress his statements to Caldas and reverse his convictions.

Defendant, however, further argues his claim under the Vienna Convention should be read as part of a "'broader challenge'" of the voluntariness of his statements to police, a claim the *Sanchez-Llamas* court noted a defendant could raise. (*Sanchez-Llamas v. Oregon, supra,* 548 U.S. at p. 350.) Defendant contends his article 36 challenge is part of a "larger attack on the legality of the interrogation he endured." Defendant refers to Justice Breyer's dissent in *Sanchez-Llamas* as support that, even though he received *Miranda* warnings, those warnings did not vitiate the need to give him the right to confer with consulate officials.[8] Thus, defendant maintains, he was entitled to a remedy —

---

[8] In dissenting, Justice Breyer explained *Miranda* does not necessarily "cure every seriously prejudicial failure to inform an arrested person of his right to contact his

24.

either suppression of his statements to Caldas or an opportunity to confer with, and secure the benefits of, the aid of consulate officials.

Article 36 does not grant a right for a consulate to *intervene* in an arrest or detention but only to be *informed* of it, and it does not guarantee defendants *any* assistance at all. (*Sanchez-Llamas v. Oregon, supra,* 548 U.S. at p. 349.) Further, as the Supreme Court noted, "[i]n most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police." (*Ibid.*) "The failure to inform a defendant of his Article 36 rights is unlikely, with any frequency, to produce unreliable confessions." (*Ibid.*)

Here, nothing suggests the failure to advise defendant of his rights under the Vienna Convention produced unreliable admissions. Defendant's statements to Caldas were voluntary and not coerced. He is not entitled to reversal of his convictions.

## DISPOSITION

The judgment is affirmed.

_____
DETJEN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
KANE, J.

_____

consular post." (*Sanchez-Llamas v. Oregon, supra,* 548 U.S. at p. 393 (dis. opn. of Breyer, J.), italics omitted.)